Hon. Karen A. Overstreet
Chapter: 11
Location: Seattle, Courtroom 7206
Hearing Date: TBD
Hearing Time: TBD
Response Date: TBD

1
2
3
4
5
6
7
8

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

9
10
11

In re:

QL2 SOFTWARE, INC.,

Debtor.

NO. 10-10209

MOTION TO DISMISS CHAPTER 11 CASE

12
13
14
15
16

Tumelson Family Limited Partnership, Katie Taylor, and Kelly Tumelson (collectively, the "Tumelsons"), by and through the undersigned counsel, hereby move to dismiss this Chapter 11 case as a bad-faith filing. The Debtor's unmistakable intention is to use Chapter 11 and the Bankruptcy Code's preference provisions solely for the purpose of trying, without being insolvent or even alleging insolvency, to avoid the judgment, settlement agreement, security interests, and payments obtained by the Tumelsons after years of expensive litigation based on the Debtor's own admittedly fraudulent activity. This motion is supported by the Declaration of Kevin Sullivan ("Sullivan Decl."), any additional evidence as may be submitted before or at the hearing, and the files and records herein. The Tumelsons respectfully state as follows:

///

17
18
19
20
21
22
23
24
25
26

MOTION TO DISMISS CHAPTER 11 CASE - 1

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

## FACTUAL BACKGROUND

1.      The Debtor operates a Seattle-based internet search firm, which is centered on a single asset, patented software technology.  It was incorporated in 2002 in Washington. The company was founded by Kelvin Chin and Ted Kubaitis, who were issued a substantial share of the company's stock.

2.      In spring 2005, Tumelsons obtained a substantial fraud judgment in federal court in Seattle against Chin and others. With interest and attorneys' fees, the judgment was over $650,000 in July 2005.

3.      In order to avoid payment of the judgment to the Tumelsons, Chin and the other company executives adopted a fraudulent scheme to hide Chin's stock and prevent Tumelsons' execution on it. The plan involved the backdating and creation of false agreements, and fictitious stock transfers between the top executives. It was known as the "parked stock agreement". As the Debtor's current Chief Operating Officer admits, these were "admittedly fraudulent activities" involving the Debtor against the Tumelsons.  (Doc. # 11, Declaration of Scott Milburn (the "Milburn Decl.") para. 19, at 5.)

4.      In March 2008, the Tumelsons' attorney sent a letter to the Debtor demanding that the Debtor issue the hidden stock to them. When the Debtor refused, the Tumelsons filed suit against it and Chin in King County Superior Court for violation of the Uniform Fraudulent Transfers Act, seeking issuance of the stock and money damages.

5.      Although the fraud was obvious and well-known at the Debtor, instead of simply issuing the stock to the Tumelsons, or at least depositing it into the registry of the court, the Debtor chose to conduct a scorched earth defense of the lawsuit. Graham & Dunn acted as the Debtor's outside counsel in that defense and in other matters.

MOTION TO DISMISS CHAPTER 11 CASE - 2

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

6.      Trial was scheduled for December 14, 2009.  The Tumelsons filed a motion for summary judgment, set for hearing on August 25, 2009.  All parties expected this motion to be granted. In order to avoid judgment, however, QL2 requested mediation. This was conducted at Graham & Dunn's offices on August 10, 2009, and resulted in a detailed, executed Settlement Agreement. (See Sullivan Decl. Ex. A.)  Seattle attorney Jerry McNaul served as the mediator. With the agreement, the Tumelsons struck their pending motion.

7.      However, on September 10, 2009, the date of the first payment, the Debtor said it would not make the payment.  The Tumelsons were forced to have Mr. McNaul conduct an arbitration to enforce the agreement and accelerate the debt, since the Debtor asserted in bad faith that no enforceable agreement existed. McNaul issued his Award on October 2, 2009 in the Tumelsons' favor. (See Sullivan Decl. Ex. B.)

8.      The Debtor continued to balk at payment, and refused to produce requested financial documents. Having exhausted their patience, the Tumelsons obtained Judgment in the amount of the Award on October 23, 2009 ($730,000 plus fees and costs). (See Sullivan Decl. Ex. C.)  The Debtor continuously promised to provide a payment plan, but never did. Accordingly, the Tumelsons obtained an Order on November 14, 2009 which required the Debtor to issue them 750,000 shares of its stock, and grant them a first-position security interest in its accounts receivable. (See Sullivan Decl. Ex. D.)  The Debtor never appealed the Judgment or the Order.  The Tumelsons garnished the Debtor's bank accounts, seizing over $500,000.

9.      At this point, the Debtor and the Tumelsons entered into a second Settlement Agreement. (See Sullivan Decl. Ex. E.)  The Debtor agreed to pay $250,000 by December 10, 2009, granted the first-position security interest in its accounts receivable and patent, and issued 750,000 shares of stock to the Tumelsons in compliance with the November 14 Order (held in

MOTION TO DISMISS CHAPTER 11 CASE - 3

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington  98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

escrow).  The Tumelsons released their garnishment writ, transferring over $500,000 to the Debtor.

10.     The company paid the $250,000 owed under the Settlement Agreement by December 10, 2009.  The next payment of $40,000 was due on January 10, 2010. Unfortunately, as this date approached, the Debtor again wanted to "re-work" the deal, as it had when it missed the September 10 payment. The Debtor advised that it now had a potential $500,000 line of credit but the Tumelsons would need to subordinate their security interest to the prospective lender. The Tumelsons refused, but said they would consider alternate protection (guaranties, additional payments at the end of the payment term, additional stock, etc.)

11.     The Debtor refused to even discuss these ideas. Instead, its Chief Operating Officer announced a plan to use this Court solely for the purpose of elimination of the Tumelson debt. He stated in a January 4, 2010, email that the Debtor would not pay the $40,000 January 10 payment, but would instead use the money to hire bankruptcy counsel, with the intention to file a preference claim. (See Sullivan Decl. Ex. F.)  The result, he asserted, would mean that the Tumelsons would have to repay the $250,000 and their security interest would be wiped out.

12.     The Debtor carried out its threat. The day after the $40,000 payment was due, the Debtor filed its Chapter 11 bankruptcy petition. Instead of paying the Tumelsons, the Debtor paid Karr Tuttle a retainer of $65,000, including to file an adversary proceeding to avoid as a preference the payments to the Tumelsons and eliminate their security interests. The Debtor has advised that it intends to assume all other prepetition contracts, thus leaving only two (secured) creditors, the Tumelsons and Graham & Dunn.

13.     The Debtor is not insolvent. According to its lawyer at the January 15, 2009 hearing, the company is valued at $10,000,000.  It had an appraised value of $9.6 million as of

MOTION TO DISMISS CHAPTER 11 CASE - 4

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington  98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

November 2008. (See Milburn Decl. para. 24.1, at 8.) It had annual sales in 2009 of almost $12,000,000 and a solid book of repeat business. (See Milburn Decl. para. 3 at 2.) The budget filed with the Court indicates the Debtor believes its revenue will substantially increase over the next few months. On a monthly basis, it has substantially greater revenue than expenses, and though the Debtor complains that it needs a line of credit and lacks cash flow, it has assured the Court that it would be able to fund approximately $604,000 in expenses from the Petition Date through the end of January in addition to having sought authority to pay even more. (See Doc. # 32.) According to the Debtor's press releases, it had fourteen consecutive "cash-positive" quarters as of June 2009, (see Sullivan Decl. Ex. G), and its Chief Executive Officer, Russell Aldrich, says that Q4 was also profitable, (see Sullivan Decl. Ex H, 1/12/10 press release)("QL2 . . . operated at a profit during the fourth quarter of last year."). Mr. Aldrich also advised the Debtor's shareholders in a January 12, 2010, letter that "[w]e are now operating profitably and we are poised for significant growth." (Sullivan Decl. Ex. I.) The Debtor's own belief is that its going concern value is unlikely to be less than the amounts owed to the Tumelsons and Graham & Dunn. (See Milburn Decl. para. 24.3, at 8.)

14.     Thus, this successful and profitable company continues to operate the same as it did before its filing in bankruptcy. Mr. Aldrich candidly disclosed the day after the Petition Date that "[t]he company will continue to operate as usual under the filing." (Sullivan Decl. Ex. I.) Its stated and obvious purpose in doing so was solely to avoid the Tumelson security interests and make them return the payments under the Settlement Agreement. As discussed previously, that Agreement was entered to allow the Debtor to satisfy its obligations under the October 23, 2009 Judgment.

MOTION TO DISMISS CHAPTER 11 CASE - 5

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

15.     The Debtor's own bankruptcy pleadings underscore the intention to use the Bankruptcy Code solely as a tool to avoid the rights obtained by the Tumelsons after lengthy, unnecessary litigation.  In the Emergency Motion for Authority to Use Cash Collateral, (Doc. # 7, the "Cash Collateral Motion"), filed the day after the Petition Date, the Debtor emphasized in bold, italicized text that:

> *[I]t is QL2's present intention to seek avoidance of the security interests of Kelly Tumelson and Katie Taylor, as well as payments made to them during the 90 days preceding the petition date and nothing in this motion or any subsequent order granting the use of cash collateral shall be evidence of or waiver of any rights QL2 may have to avoid any preferential transfers to Kelly Tumelson and Katie Taylor.*

(Cash Collateral Motion at 7.)  The original order proposed by the Debtor attached to the Cash Collateral Motion was replete with bold, italicized reservations of rights language indicating the Debtor's clear intention to use the preferential transfer statute.  Furthermore, the Milburn Declaration also is quite clear that the Debtor anticipates it "will seek to have these security interests avoided in the near future as part of this bankruptcy filing."  (Milburn Declaration para. 17, at 5.)

16.     On January 21, 2010, the Debtor fulfilled its promise and filed the Complaint to Avoid Preferential Transfers and Recover Preferential Payments.  (Doc. # 41, the "Complaint")  On its face, the Complaint is deficient and only demonstrates the Debtor's intention to harass, deter, and delay the Tumelsons.  The Debtor alleges no facts supporting a finding of insolvency and does not even specifically allege the insolvency element of the prima facie preference case.  That is because such an allegation would be false and inconsistent with the Debtor's own position that it is worth about $10 million.  The Tumelsons reserve all rights and defenses with respect to the Complaint.

MOTION TO DISMISS CHAPTER 11 CASE - 6

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington  98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

17.     The Debtor singles out the Tumelsons and their security interests for attack. However, the Debtor does not indicate any intention to pursue avoidance and recovery of security interest grants or payments to Graham & Dunn in the 90 days before the Petition Date (or year before the Petition Date to the extent Graham & Dunn partner Patrick J. Franke, the lead attorney for the relationship between that firm and the Debtor, also participated in the management of the Debtor, hired the headhunter that placed Russell Aldrich as the Debtor's CEO, and hired the accounting firm that conducted the investigation of the Debtor's involvement in the fraudulent scheme relating to the stock of Kelvin Chin, thus creating insider status). If the Debtor were looking out for the interests of all creditors, it would be equally intent on avoiding the security interests of Graham & Dunn.

## LEGAL ARGUMENT

This Chapter 11 case should be dismissed as a bad faith filing. Filing for bankruptcy just to try to use the preference law against a particular creditor under these circumstances is by itself not in good faith. Furthermore, the filing also fails the multifactor test showing bad faith.

**I.      Filing for bankruptcy just to try to use the preference law is not in good faith.**

Filing solely to gain advantage of the preference avoidance powers is in bad faith warranting dismissal. See In re Northwest Place, Ltd., 73 BR 978 (Bkrtcy. N.D. Ga. 1987) (copy attached as Exhibit A hereto). A case exactly on point, Northwest Place relies primarily on decisions of bankruptcy courts in the Ninth Circuit. The Northwest Place court explains why such a filing is so contrary to the spirit of the Bankruptcy Code, especially where the parties have had every opportunity to resolve their disputes through extensive state court litigation and settlement:

> The sole purpose of this case is not to reorganize within the historical meaning of that word in the context of the Bankruptcy Code. Rather, the Debtor is using the provisions of Chapter 11 to

MOTION TO DISMISS CHAPTER 11 CASE - 7

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{01318120.PDF;1 }

assert the powers of the trustee as a debtor-in-possession in order to set aside the security interest of the Coopers. The real issue in this case involves state law: the formation of a partnership and the dissolving of that partnership by converting an equity partner into a secured creditor. The Debtor wants to readjust its relationship to the Coopers by invoking federal jurisdiction. Full faith and comity will not permit this. Bankruptcy relief for that readjustment is not available. The Debtor and the Kaiser entities struck a deal with the Coopers. It was done in the setting of litigation before the Superior Court of Fulton County. The Superior Court Judge signed the consent order, along with all of the parties to that litigation. The Debtor has failed to show that the transaction affected any entity except, perhaps, itself and the other related entities. There are a few other inconsequential unsecured creditors, and none have voiced any opposition to the Coopers' Motion to Dismiss.

. . .

The real purpose of the filing of this case was to bring the 11-count adversary complaint to set aside the transfer to the Coopers. The counts based upon state law may be asserted in the appropriate state court forum. The counts based upon the Bankruptcy Code are an attempt to misuse those provisions. Section 548 of the Bankruptcy Code was not intended to be used to set aside a transfer done by consent through a state court order especially where no other additional parties are involved. Under these particular circumstances, this Court will not allow a party to state court litigation to seek refuge within the Bankruptcy laws of the United States in order to undo what it agreed to do in a consent order signed by the state court, particularly when it will only benefit the Debtor and related entities.

The holding that use of bankruptcy simply to take advantage of preference law against a single creditor constitutes bad faith is consistent with other courts' holdings as to other specific provisions of the Bankruptcy Code. The Third Circuit has since cited Northwest Place, noting that a desire to take advantage of a particular provision of the Bankruptcy Code may evidence the Debtor's bad faith. See In re Integrated Telecom Express, Inc., 384 F.3d 108, 112 (3rd Cir. 2004). Moreover, Northwest Place itself cites law from a court within the Ninth Circuit to support this rationale:

MOTION TO DISMISS CHAPTER 11 CASE - 8

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

In the case of *In re So. Cal. Sound Sys., Inc.*, 69 B.R. 893 (Bankr.S.D.Cal. 1987), the Court found that where a debtor had filed a petition under Chapter 11 for the sole purpose of taking advantage of the Bankruptcy Code's provision for rejecting an executory contract pursuant to § 365, the debtor had filed its petition in bad faith. The Court stated that "[w]here the Court becomes convinced that the true purpose of filing a petition is other than to reorganize a financially distressed business, but to merely take advantage of one of the remedies available under the Code, dismissal is appropriate in order to protect the jurisdictional integrity of the Court." 69 Bankr. at 900. (citations omitted). This is exactly what the Debtor herein is attempting: to set aside the transfer to the Coopers pursuant to the avoidance powers provided in the Code.

73 B.R at 980. The preference statute is something that does not exist under Washington state law, but only under the Bankruptcy Code. The Debtor's stated intention, now being carried out through the Complaint, is to use this case to take advantage of that provision.

Bankruptcy is a holistic remedy, and is not designed to allow debtors to take up the sword against one creditor. Many cases hold that a filing solely or primarily to avoid payment to secured creditors or to alter or impair their security, is a form of forum shopping and not in good faith. See In re Walter, 108 B.R. 244, 250 (Bankr. C.D.Cal. 1989); Albany Partners, Ltd., 749 F.2d 670, 674 (11th Cir. 1984); In re Silberkraus, 336 F.3d 864, 871 (9th Cir. 2003).

**II. This bankruptcy also fails the multifactor test of bad faith used in the Ninth Circuit.**

The Ninth Circuit Court of Appeals has clearly established that lack of good faith constitutes cause for dismissal under Section 1112(b) of the Bankruptcy Code. See In re Marsch, 36 F.3d 825, 828 (9th Cir. 1994). The requirement of good faith is not met by the debtor's subjective intent in filing a petition but rather, the requirement includes "several, distinct equitable limitations that courts have placed on Chapter 11 filings"" Id. The purpose of these limitations is to "deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws." Id.

MOTION TO DISMISS CHAPTER 11 CASE - 9

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

Lack of good faith is determined by the totality of circumstances surrounding the case and turns on "whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis." In re Marsch, 36 F.3d at 828. In addition, a debtor may not use Chapter 11 as a litigation tactic and, specifically, not to avoid posting a supersedeas bond. In re Karum Group, Inc., 66 B.R. 436, 438 (Bankr. W.D. Wash. 1986). The Debtor is now essentially attempting to use this Court as a court of appeals from the Settlement Agreement that the Debtor voluntarily entered into.

To determine whether a case should be dismissed for lack of good faith, courts within the Ninth Circuit have weighed a variety of circumstantial factors including the following:

(1) whether the debtor has only one asset;

(2) whether the debtor has an ongoing business to reorganize;

(3) whether there are any unsecured creditors;

(4) whether the debtor has any cash flow or sources of income to sustain a plan of reorganization or to make adequate protection payments; and

(5) whether the case is essentially a two-party dispute capable of prompt adjudication in state court.

In re WLB-RSK Venture, 296 B.R. 509, 514 (Bankr. C.D. Cal. 2003), citing In re St. Paul Self Storage Ltd. Partnership, 185 B.R. 580, 582-83 (Bankr. 9th Cir. 1995).

In In re Chu, 253 B.R. 92 (S.D. Cal. 2000), the District Court affirmed the bankruptcy court's finding of bad faith where (1) the debtor had only one significant creditor who became a creditor as a result of a state court judgment, (2) the debtor filed the bankruptcy in response to the creditor's state court victory and to avoid filing a supersedeas bond, (3) the debtor and his co-defendants in the state court action had sufficient combined assets to post a bond, (4) the record supported that the debtor could not propose a plan of reorganization with any reasonable likelihood of confirmation and that the bankruptcy was filed as a litigation tactic and in order for

MOTION TO DISMISS CHAPTER 11 CASE - 10

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

the debtor to maintain control of his primary asset indefinitely; and (5) the debtor's schedules contained several inconsistencies including debts to family members which were not disclosed in an affidavit of assets and liabilities filed with the state court four months prior to the bankruptcy. Id. at 97.

There are a number of "recurrent factors" that indicate bad faith filings. Those factors include: (1) the debtor has one asset; (2) the debtor engaged in improper prepetition conduct; (3) the debtor can identify only a few unsecured creditors; (4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against foreclosure in state court, (5) the debtor and a single creditor proceeded to a standstill in state court and the debtor has lost or has been required to post a bond which it cannot afford; (6) the filing of a petition allows the debtor to evade court orders; (7) the debtor has no ongoing business or employees; and (8) the lack of possibility of reorganization. See In re Chu, 253 B.R. at 95 (citing similar standards from many other circuits). There is no bright line, talismanic number of factors which must exist to find bad faith; the weight of any given factor depends on the fact and circumstances of the case. Id. In In re Marsch and In re Chu, the Ninth Circuit and the District Court both found that the debtors in those cases filed their Chapter 11s in bad faith as improper litigation tactics.

All of the factors considered by the courts in the Ninth Circuit support dismissal of this case as not filed in good faith. This is shown by analysis of the factors in Chu.

First, the Debtor's business centers around a patented technology used for internet search services. Though intangible, this may be considered to be a single asset to the extent it is responsible for the Debtor's funds, just as where rents constitute all of the revenue of a single asset real estate debtor.

MOTION TO DISMISS CHAPTER 11 CASE - 11

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

Second, the Debtor engaged in improper prepetition conduct.  Although the Debtor "admittedly" – in its COO's words – defrauded the Tumelsons, it compounded the pain by compelling them to incur huge litigation expenses in prosecution of suit in state court.  In order to avoid judgment, it entered into a Settlement Agreement and promptly repudiated it, forcing additional litigation and resulting in a judgment.  Instead of paying a nominal payment due under the second Settlement Agreement that followed, it instead filed bankruptcy.

Third, for all practical purposes, there are no other unsecured, non-insider creditors here.  From the outset of the case, the Debtor has sought to treat its prepetition vendors with special care, going so far as to propose a critical vendors order, despite being clearly contrary to binding Ninth Circuit law.  Having lost that effort, the Debtor has stated its plans to assume its prepetition contracts, other than a real property lease in Georgia, and in the interim cash collateral budget has identified the preferred recipients of postpetition payments that are pro rated to prepetition obligations.  In effect the only creditors will be the Tumelsons and Graham & Dunn, whose claim may be subject to serious doubt.

Fourth, the Debtor was unable to prevent collection proceedings in state court, and entered into the Settlement Agreement to stop them.  It had no defense.  The Debtor now seeks to avoid its bargain.

Fifth, the Debtor and a single creditor (the Tumelsons) proceeded to a standoff and the Debtor lost.  In lieu of posting a supersedeas bond, the Debtor entered into the Settlement Agreement, which it now seeks to avoid by filing for bankruptcy.  It is just not the case that the Debtor had no other alternative.  See In re Byrd, 172 B.R. 970, 973 (Bankr. W.D. Wash. 1994).  At the time of the Judgment, the Debtor took no action to stay it.  After the Settlement Agreement, the Tumelsons were open to creative solutions to facilitate the Debtor's desire to

MOTION TO DISMISS CHAPTER 11 CASE - 12

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington  98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

obtain financing.  However, the Debtor made the decision to file.  There was no pressing creditor action to make that decision remotely reasonable.  The Debtor actually had the money to pay the Tumelsons the monthly payment under the Settlement Agreement; it just chose to spend it on a retainer for bankruptcy counsel instead.

Sixth, the filing of the Chapter 11 petition allows the Debtor to pursue its intention to evade court orders – the October 27, 2009 Judgment and the November 14, 2009 Order – which provide not only for payment of claims but specific actions to be performed by the Debtor to make up for its admittedly fraudulent behavior.

Seventh, the Debtor has no plans and does not need Chapter 11 to reorganize.  As discussed above, the Debtor is profitable and operates precisely as it did before filing.  This Chapter 11 was admittedly filed for the sole purpose of avoiding security granted to the Tumelsons by the Debtor in the Settlement Agreement and to force the Tumelsons to repay $250,000.  The Debtor cannot use the bankruptcy courts simply to use special provisions of the Bankruptcy Code unavailable under other law to stymie a secured creditor's efforts to collect its judgments or to avoid a contract.

The Debtor's goal is not a speedy, efficient reorganization, but only to stay collection on the Judgment to the prejudice of Tumelsons.  See In re Erkins, 253 B.R. 470, 475 (Bankr. D. Id. 2000)(dismissing case where debtor's intent was to fight on appeal without the financial burden of a proper appeal bond and will only pay if the appeal turns out badly, by which time assets may be gone).  The Debtors do not need to be in bankruptcy; they have other protections available, such as state court oversight of the collection process, such as through supplemental proceedings. See id. at 476.  The Debtors have admitted that the $40,000 payment on the Settlement Agreement is the reason for the filing.  The case is a classic two-party dispute, and the filing of

MOTION TO DISMISS CHAPTER 11 CASE - 13

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington  98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

the petition was intended only to delay and frustrate Tumelsons. See In re St. Paul, 185 B.R. at 584; In re Erkins, 253 B.R. at 476; In re Tucson Properties Corp., 193 B.R. 292, 300 (Bankr. D. Ariz. 1995).

The Tumelsons should not be forced to fund the Debtor's adversary proceeding. The Debtor is using bankruptcy to enhance its own insiders' position at the expense of Tumelsons and the estate. See In re Murph's Bowling Ctr., 244 B.R. 162, 165 (Bankr. D. Mont. 2000) (dismissing case where debtor used bankruptcy to enhance position of insiders at expense of unsecured creditors); In re Casey, 198 B.R. 910, 916-17 (Bankr. S.D. Cal. 1996)(dismissing case where debtor seeks to attack state court judgment by claim objection or appeal without bond, while funding professional fees for that fight from assets that would be available for collection by creditor, depriving creditor of right to enforce and without any protection for creditor by bond); In re Boynton, 184 B.R. 580, 584 (Bankr. S.D. Cal. 1995)(creditor is funding appeal against itself by debtor's continuing use of liquid assets).

The question is whether the value of the company will inure to the benefit of the shareholders and highly-compensated executives, and not the two creditors, the Tumelsons and Graham & Dunn. In these circumstances, the Tumelsons should not be forced to spend time, money, and energy in a Chapter 11 proceeding designed solely to protect management and the shareholders.

## CONCLUSION

The Debtor has taken a two-party dispute, capable of adjudication in debt collection proceedings in King County Superior Court, and placed it into bankruptcy for illegitimate reasons: only to use the preference provisions, where the Debtor by its own admissions is not even insolvent. The Tumelsons and the Debtor carefully negotiated a second Settlement

MOTION TO DISMISS CHAPTER 11 CASE - 14

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

Agreement at considerable expense after Debtor refused to comply with the provisions of the first Settlement Agreement reached at the August 10, 2009 mediation.  The terms of the Settlement Agreement are hardly onerous – the Debtor filed bankruptcy because it refused to make a $40,000 payment (instead paying $65,000 as a retainer to bankruptcy counsel) or to consider other alternatives, although it claims to be a $10 million company with substantial cash revenues.  For these reasons, the Court should dismiss this Chapter 11 case as a bad faith filing.

WHEREFORE, the Tumelsons respectfully request that the Court (1) grant this motion, (2) dismiss this Chapter 11 case immediately, with a bar to refiling, and (3) grant such other relief as is just and proper under the circumstances of this case.  A proposed order is attached hereto as Exhibit B.

DATED this 22nd day of January, 2010.

CAIRNCROSS & HEMPELMANN, P.S.


/s/   John R. Knapp, Jr.
John R. Knapp, Jr., WSBA No. 29343
John R. Rizzardi, WSBA No. 9388
Attorneys for Tumelson Family Limited
Partnership, Katie Taylor, and Kelly Tumelson

MOTION TO DISMISS CHAPTER 11 CASE - 15

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington  98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*