Hon. Karen A. Overstreet
Chapter: 11
Location: Seattle, Courtroom 7206
Hearing Date: TBD
Hearing Time: TBD
Response Date: TBD

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| In re: | NO. 10-10209 |
|---|---|
| QL2 SOFTWARE, INC., | DECLARATION OF KEVIN SULLIVAN IN SUPPORT OF MOTION TO DISMISS CHAPTER 11 CASE |
| Debtor. | |

Kevin P. Sullivan states and declares as follows:

1. I am one of the attorneys for Tumelson Family Limited Partnership, Katie Taylor, and Kelly Tumelson (collectively, the "Tumelsons") and a partner at Sullivan & Thoreson. I was admitted to the Washington State Bar in 1981 and maintain a civil trial practice. I represented the Tumelsons in their state court litigation with the Debtor. I make this Declaration from my personal knowledge, except where indicated.

2. The Debtor operates a Seattle-based internet search firm, which is centered on a single asset, patented software technology. It was incorporated in 2002 in Washington. The company was founded by Kelvin Chin and Ted Kubaitis, who were issued a substantial share of the company's stock.

DECLARATION OF KEVIN SULLIVAN IN SUPPORT OF MOTION TO DISMISS CHAPTER 11 CASE - 1

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{01318119.PDF;1}
Case 10-10209-KAO   Doc 43   Filed 01/22/10   Entered 01/22/10 12:23:05   Page 1 of 7

3. In spring 2005, Tumelsons obtained a substantial fraud judgment in federal court in Seattle against Chin and others. With interest and attorneys' fees, the judgment was over $650,000 in July 2005.

4. In order to avoid payment of the judgment to the Tumelsons, Chin and the other company executives adopted a fraudulent scheme to hide Chin's stock and prevent Tumelsons' execution on it. The plan involved the backdating and creation of false agreements, and fictitious stock transfers between the top executives. It was known as the "parked stock agreement". As the Debtor's current Chief Operating Officer admits, these were "admittedly fraudulent activities" involving the Debtor against the Tumelsons. (Doc. # 11, Declaration of Scott Milburn (the "Milburn Decl.") para. 19, at 5.)

5. In March 2008, I sent a letter to the Debtor demanding that the Debtor issue the hidden stock to them. When the Debtor refused, the Tumelsons filed suit against it and Chin in King County Superior Court for violation of the Uniform Fraudulent Transfers Act, seeking issuance of the stock and money damages.

6. Although the fraud was obvious and well-known at the Debtor, instead of simply issuing the stock to the Tumelsons, or at least depositing it into the registry of the court, the Debtor chose to conduct a scorched earth defense of the lawsuit. Graham & Dunn acted as the Debtor's outside counsel in that defense and in other matters.

7. Trial was scheduled for December 14, 2009. The Tumelsons filed a motion for summary judgment, set for hearing on August 25, 2009. All parties expected this motion to be granted. In order to avoid judgment, however, QL2 requested mediation. This was conducted at Graham & Dunn's offices on August 10, 2009, and resulted in a detailed, executed Settlement

DECLARATION OF KEVIN SULLIVAN IN SUPPORT OF MOTION TO DISMISS CHAPTER 11 CASE - 2

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{01318119.PDF;1}
Case 10-10209-KAO    Doc 43    Filed 01/22/10    Entered 01/22/10 12:23:05    Page 2 of 7

Agreement. (See Ex. A hereto.) Seattle attorney Jerry McNaul served as the mediator. With the agreement, the Tumelsons struck their pending motion.

8. However, on September 10, 2009, the date of the first payment, the Debtor said it would not make the payment. The Tumelsons were forced to have Mr. McNaul conduct an arbitration to enforce the agreement and accelerate the debt, since the Debtor asserted in bad faith that no enforceable agreement existed. McNaul issued his Award on October 2, 2009 in the Tumelsons' favor. (See Ex. B hereto.)

9. The Debtor continued to balk at payment, and refused to produce requested financial documents. Having exhausted their patience, the Tumelsons obtained Judgment in the amount of the Award on October 23, 2009 ($730,000 plus fees and costs). (See Ex. C hereto.) The Debtor continuously promised to provide a payment plan, but never did. Accordingly, the Tumelsons obtained an Order on November 14, 2009 which required the Debtor to issue them 750,000 shares of its stock, and grant them a first-position security interest in its accounts receivable. (See Ex. D hereto.) The Debtor never appealed the Judgment or the Order. The Tumelsons garnished the Debtor's bank accounts, seizing over $500,000.

10. At this point, the Debtor and the Tumelsons entered into a second Settlement Agreement. (See Ex. E hereto.) The Debtor agreed to pay $250,000 by December 10, 2009, granted the first-position security interest in its accounts receivable and patent, and issued 750,000 shares of stock to the Tumelsons in compliance with the November 14 Order (held in escrow). The Tumelsons released their garnishment writ, transferring over $500,000 to the Debtor.

11. The company paid the $250,000 owed under the Settlement Agreement by December 10, 2009. The next payment of $40,000 was due on January 10, 2010. Unfortunately,

DECLARATION OF KEVIN SULLIVAN IN SUPPORT OF MOTION TO DISMISS CHAPTER 11 CASE - 3

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{01318119.PDF;1 }
Case 10-10209-KAO    Doc 43    Filed 01/22/10    Entered 01/22/10 12:23:05    Page 3 of 7

as this date approached, the Debtor again wanted to "re-work" the deal, as it had when it missed the September 10 payment. The Debtor advised that it now had a potential $500,000 line of credit but the Tumelsons would need to subordinate their security interest to the prospective lender. The Tumelsons refused, but said they would consider alternate protection (guaranties, additional payments at the end of the payment term, additional stock, etc.)

12. The Debtor refused to even discuss these ideas. Instead, its Chief Operating Officer announced a plan to use this Court solely for the purpose of elimination of the Tumelson debt. He stated in a January 4, 2010, email to me that the Debtor would not pay the $40,000 January 10 payment, but would instead use the money to hire bankruptcy counsel, with the intention to file a preference claim. (See Ex. F hereto.) The result, he asserted, would mean that the Tumelsons would have to repay the $250,000 and their security interest would be wiped out.

13. The Debtor carried out its threat. The day after the $40,000 payment was due, the Debtor filed its Chapter 11 bankruptcy petition. Instead of paying the Tumelsons, the Debtor paid Karr Tuttle a retainer of $65,000, including to file an adversary proceeding to avoid as a preference the payments to the Tumelsons and eliminate their security interests. The Debtor has advised that it intends to assume all other prepetition contracts, thus leaving only two (secured) creditors, the Tumelsons and Graham & Dunn.

14. The Debtor is not insolvent. According to its lawyer at the January 15, 2009 hearing, the company is valued at $10,000,000. It had an appraised value of $9.6 million as of November 2008. (See Milburn Decl. para. 24.1, at 8.) It had annual sales in 2009 of almost $12,000,000 and a solid book of repeat business. (See Milburn Decl. para. 3 at 2.) The budget filed with the Court indicates the Debtor believes its revenue will substantially increase over the

DECLARATION OF KEVIN SULLIVAN IN SUPPORT OF MOTION TO DISMISS CHAPTER 11 CASE - 4

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

next few months. On a monthly basis, it has substantially greater revenue than expenses, and though the Debtor complains that it needs a line of credit and lacks cash flow, it has assured the Court that it would be able to fund approximately $604,000 in expenses from the Petition Date through the end of January in addition to having sought authority to pay even more. (See Doc. # 32.) According to the Debtor's press releases, it had fourteen consecutive "cash-positive" quarters as of June 2009, (see Ex. G hereto), and its Chief Executive Officer, Russell Aldrich, says that Q4 was also profitable, (see Ex H hereto, 1/12/10 press release)("QL2 . . . operated at a profit during the fourth quarter of last year."). Mr. Aldrich also advised the Debtor's shareholders in a January 12, 2010, letter that "[w]e are now operating profitably and we are poised for significant growth." (Ex. I hereto.) The Debtor's own belief is that its going concern value is unlikely to be less than the amounts owed to the Tumelsons and Graham & Dunn. (See Milburn Decl. para. 24.3, at 8.)

15. Thus, this successful and profitable company continues to operate the same as it did before its filing in bankruptcy. Mr. Aldrich candidly disclosed the day after the Petition Date that "[t]he company will continue to operate as usual under the filing." (Ex. I hereto.) Its stated and obvious purpose in doing so was solely to avoid the Tumelson security interests and make them return the payments under the Settlement Agreement. As discussed previously, that Agreement was entered to allow the Debtor to satisfy its obligations under the October 23, 2009 Judgment.

16. The Debtor's own bankruptcy pleadings underscore the intention to use the Bankruptcy Code solely as a tool to avoid the rights obtained by the Tumelsons after lengthy, unnecessary litigation. In the Emergency Motion for Authority to Use Cash Collateral, (Doc. #

DECLARATION OF KEVIN SULLIVAN IN SUPPORT OF MOTION TO DISMISS CHAPTER 11 CASE - 5

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{01318119.PDF;1}
Case 10-10209-KAO    Doc 43    Filed 01/22/10    Entered 01/22/10 12:23:05    Page 5 of 7

7, the "Cash Collateral Motion"), filed the day after the Petition Date, the Debtor emphasized in bold, italicized text that:

> **[I]t is QL2's present intention to seek avoidance of the security interests of Kelly Tumelson and Katie Taylor, as well as payments made to them during the 90 days preceding the petition date and nothing in this motion or any subsequent order granting the use of cash collateral shall be evidence of or waiver of any rights QL2 may have to avoid any preferential transfers to Kelly Tumelson and Katie Taylor.**

(Cash Collateral Motion at 7.) The original order proposed by the Debtor attached to the Cash Collateral Motion was replete with bold, italicized reservations of rights language indicating the Debtor's clear intention to use the preferential transfer statute. Furthermore, the Milburn Declaration also is quite clear that the Debtor anticipates it "will seek to have these security interests avoided in the near future as part of this bankruptcy filing." (Milburn Declaration para. 17, at 5.)

17. On January 21, 2010, the Debtor fulfilled its promise and filed the Complaint to Avoid Preferential Transfers and Recover Preferential Payments. (Doc. # 41, the "Complaint") On its face, the Complaint is deficient and only demonstrates the Debtor's intention to harass, deter, and delay the Tumelsons. The Debtor alleges no facts supporting a finding of insolvency and does not even specifically allege the insolvency element of the prima facie preference case. That is because such an allegation would be false and inconsistent with the Debtor's own position that it is worth about $10 million. The Tumelsons reserve all rights and defenses with respect to the Complaint.

18. The Debtor singles out the Tumelsons and their security interests for attack. However, the Debtor does not indicate any intention to pursue avoidance and recovery of security interest grants or payments to Graham & Dunn in the 90 days before the Petition Date

DECLARATION OF KEVIN SULLIVAN IN SUPPORT OF MOTION TO DISMISS CHAPTER 11 CASE - 6

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

(or year before the Petition Date to the extent Graham & Dunn partner Patrick J. Franke, the lead attorney for the relationship between that firm and the Debtor, also participated in the management of the Debtor, hired the headhunter that placed Russell Aldrich as the Debtor's CEO, and hired the accounting firm that conducted the investigation of the Debtor's involvement in the fraudulent scheme relating to the stock of Kelvin Chin, thus creating insider status). If the Debtor were looking out for the interests of all creditors, it would be equally intent on avoiding the security interests of Graham & Dunn.

I declare that the foregoing is true and correct under penalty of perjury of the laws of the State of Washington.

EXECUTED this 22nd day of January, 2010, at Seattle, Washington.

/s/ Kevin P. Sullivan
Kevin P. Sullivan

DECLARATION OF KEVIN SULLIVAN IN SUPPORT OF MOTION TO DISMISS CHAPTER 11 CASE - 7

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*