The Honorable Karen A. Overstreet
Chapter 11
Hearing Location: 700 Stewart St., Rm. **7206**

Hearing Date: April 27, 2010 (for Overbid Procedures)
Hearing Time: 9:30 a.m.
Responses due at time of hearing

Hearing Date: June 4, 2010 (for the Sale)
Hearing Time: 9:30 a.m.
Response Date: May 28, 2010

**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| In re<br><br>QL2 SOFTWARE, INC.<br>316 Occidental Ave. S, Ste. 410<br>Seattle, WA 98104<br><br>Debtor. | Case No. 10-10209<br>SALE MOTION TO APPROVE:<br>(A) SCHEDULING AN AUCTION AND HEARING TO APPROVE THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS;<br>(B) OVERBID PROCEDURES FOR SUCH SALE;<br>(C) TOPPING FEE AND EXPENSE REIMBURSEMENTS; (D) THE FORM AND SCOPE OF NOTICE OF THE OVERBID PROCEDURES AND AUCTION |

QL2 Software, Inc., debtor and debtor-in-possession (herein “QL2” or “Debtor”), moves the Court to approve (a) scheduling an auction and hearing to approve the sale of substantially all of the assets of the Debtor free and clear of all liens, claims, interests and encumbrances pursuant to Bankruptcy Code §363; (b) overbid procedures for such sale; (c) topping fee and expense reimbursements; (d) form and scope of notice of the Overbid Procedures and Auction. This



*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

motion ("Sale Motion") is based on the files and records herein and on the accompanying Declaration of Brian Vincent (the "Vincent Declaration") and the Exhibit attached thereto.

I. FACTUAL BACKGROUND

A. The Debtor and Its Business.

On January 11, 2010 ("Petition Date"), the Debtor commenced this chapter 11 case by filing a voluntary petition under chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its affairs as debtor-in-possession under 11 U.S.C. §§ 1107 and 1108.

QL2 is a Washington corporation which provides its customers access, through an automated data gathering process, to necessary competitive pricing and product data. QL2 was founded in 2002. QL2 has two wholly owned foreign subsidiaries, QL2 Software (India) Private Limited, and QL2 Europe LTD. QL2 has more than 212 customers in 40 countries, including nine Fortune 500 companies. The QL2 client roster includes more than 90 airlines, three of the top five global pharmaceuticals, and market leaders in retail, consumer products, and life sciences. Its revenue has been increasing steadily—$7.4M in 2007, $11.1M in 2008, and $11.2M in 2009. QL2 employs 143 people, including 35 in Seattle, eight in Atlanta, three in London, and 97 in India.

B. Events Leading to the Bankruptcy.

In 2008, QL2 anticipated raising private equity capital during the first half of 2009, based on optimistic revenue projections. However, by late 2008, the global economy soured and many of the projects anticipated from existing customers and those in its pipeline were delayed. The company was also faced with two lawsuits. Venture capital firms approached by QL2 delayed their decision or passed altogether because they could not assess the condition of the business. By mid-2009, QL2 found itself without a private equity suitor, revenue short of projections, and



Law Offices
KARR TUTTLE CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

the need to lay off employees instead of having resources for expansion. QL2 was in survival mode from September to December 2009, revising its revenue forecasts downward several times over the course of 2009. Since January 2009, headcount has been reduced by a total of 21 employees. The fact that the Company was in a downturn, could not raise private equity, and was looking at stagnant sales growth also lessened the possibility of getting a line of credit from a banking source.

In late 2009, in the absence of a line of credit, limited cash resources, and faced with scheduled obligations to creditors, QL2's management determined that QL2 could not survive the next several months as a going concern and that closing the business entirely was a likely outcome. QL2 was therefore forced to proceed with the Chapter 11 filing so it could obtain relief from its financial obligations and smooth out its cash flow, while it evaluated various options, including reorganization or a sale of the assets.

Since the bankruptcy filing, the Debtor has made substantial efforts to market and sell its business as a going concern. On February 5, 2010, the Board of QL2 retained Brian Vincent, a management consultant, to assist with the sale process. On April 5, 2010, with the departure of Russ Aldrich as CEO, the Board appointed Vincent as Interim CEO.

The Debtor has actively sought a suitor and received numerous inquiries, including two letters of intent. The Debtor entered into negotiations with both entities, with respect to both a proposed sale and a proposed DIP Facility.[1] These negotiations have been extensive and took place over the course of more than eight weeks. Ultimately, the Debtor entered into a proposed sale to DMEP Corporation d/b/a/ Hale Global or its designee, assignee or nominee ("Hale") of

---

[1]QL2 ultimately decided not to pursue the DIP Facility but to move expeditiously for sale of the assets.



*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

substantially all of the Debtor's assets for the aggregate consideration of $10,000,000 ("Purchase Price"). A copy of the proposed Purchase and Sale Agreement ("APA") is attached as Exhibit A to Vincent Declaration.[2]

Based on the Debtor's post-petition sale efforts and contacts with potentially interested parties, the Debtor is confident that the proposed consideration to be paid by Hale is fair and reasonable, and certain that it is the highest and best offer received to date. Current financial and cash flow issues dictate that a sale be consummated quickly to ensure the value of the Debtor's business is preserved. Indeed, absent an expeditious sale, the value of the Debtor as a going concern will be placed in severe jeopardy.

## II. SUMMARY OF TERMS OF PROPOSED SALE

Following is a summary of some of the material terms of the proposed sale ("Proposed Asset Sale") as set forth in the APA:[3]

A. Assets to be Purchased. The assets to be purchased (the "Purchased Assets") include all of Seller's rights, title, and interest in and to all of the Seller's properties other than the Excluded Assets in accordance with, and with all of the protections afforded by section 363 of the Bankruptcy Code:

> (i) All of Company's tangible personal property, supplies, computers, printers, equipment, furniture, fixtures, goods and other similar assets (collectively, the "Fixed Assets");

---

[2] As discussed in section III. B, access to the schedules can be obtained from Seller by completing a confidentiality agreement and submitting it as provided in that section.

[3] This description of the terms of the APA is intended solely to provide the Court and interested parties with an overview of the significant terms of the APA. The Court and interested parties are respectfully referred to the APA for the complete terms of the Proposed Asset Sale. In the event of a conflict between the terms included in this overview and the APA, the APA shall govern. Capitalized terms not defined in this Sale Motion have the meanings given in the APA.



Law Offices
KARR TUTTLE CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

(ii) All of Company's rights and benefits under agreements, contracts, leases, licenses, instruments, commitments and understandings, written or oral (collectively, "Contracts"), as identified by Seller and later to be designated by Purchaser as Assumed Contracts;

(iii) All of Company's trade names, trademarks, service marks and service names, as well as internet domain names (including registrations, licenses and applications pertaining thereto), including, together with all goodwill associated therewith (the "Trademarks");

(iv) All rights of Company in and to (i) the customer and client lists, vendor lists, catalogues, data relating to vendors, promotion lists and marketing data and other compilations of names and requirements; (ii) telephone numbers, internet addresses and web sites; and (iii) other material information related to Company's business;

(v) All rights of Company in and to general intangibles, computer programs, designs, processes, drawings, schematics, blueprints, copyrights, copyright applications, inventions, processes, know-how, trade secrets, patents, patent applications and other proprietary information, (the "Intangible Property Rights") which shall include, at a minimum, all Intangible Property Rights for the Company's WebQL product and related technology;

(vi) All accounts, accounts receivable, notes receivable, chattel paper, documents (including without limitation any undeposited checks or bills as the Closing Date, whether received or in transit), and all other receivables of any type or nature of Company including, but not limited to, all accounts receivable arising from bona fide transactions for the sale of licenses or maintenance or services, entered in good faith, involving existing products of Company entered into in the ordinary course of business that meet certain requirements, referred to as "Qualified Accounts Receivable;"

(vii) Any cause of action, claim, suit, proceeding, judgment or demand, of any nature, of or held by Company against any third parties arising out of the Business;

(viii) Any and all interests in the investments, joint ventures and subsidiaries that Purchaser specifically designates in writing by no later than May 7, 2010;

(ix) All goodwill associated with Company's business and the Assets, including all of the Intangible Property Rights; and

(x) All rights in and to any governmental and private permits, licenses, certificates of occupancy, franchises and authorizations, to the extent assignable, used in or relating to Company's business or the Assets.

(Excluded Assets, which includes cash, cash deposits and cash equivalents, are further set forth in Section l(b) of the APA.)



Law Offices
KARR TUTTLE CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

B. Assumed/Rejected Contracts. The Debtor proposes to assume and assign to Purchaser certain contracts and to reject others. These will be set forth in a separate motion after those contracts have been identified and accepted by the Purchaser.

C. Conditions. Debtor's and Purchaser's respective obligations to consummate the transactions contemplated in the APA are subject to satisfaction of the conditions set forth in Article VII of the APA. Consummation of the sale under the APA is conditioned upon, inter alia, entry of the Overbid Procedures Order and Sale Order (as defined below in section III), attached hereto as Exhibits A and B, respectively.

## III. PROPOSED OVERBID PROCEDURES

The Debtor and Purchaser recognize that the sale of the Purchased Assets as contemplated by the APA is subject to receipt by the Debtor of higher and better offers. Therefore, Debtor seeks authority to implement certain procedures to ensure that the Debtor's estate will obtain the best return possible. The Debtor thus requests that the Court enter an Overbid Procedures Order approving the following bidding procedures (the "Overbid Procedures") to be employed with respect to the Proposed Asset Sale.

The Proposed Asset Sale is subject to competitive bidding as set forth herein and approval by the Court at a hearing under section 363 of the Bankruptcy Code (the "Sale Hearing"), after which the "Sale Order" will be entered. The following overbid provisions and related bid protections are designed to compensate Purchaser for its efforts to date and the concomitant benefits conferred upon Debtor, and to facilitate a full and fair process designed to maximize the value of the Purchased Assets for the benefit of Debtor's stakeholders.[4]

---

[4] Terms not otherwise defined in this section shall have the meanings ascribed to such terms in the Overbid Procedures. This summary of the Overbid Procedures terms is meant only as a summary of such terms and to the



Law Offices
KARR TUTTLE CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

A. Designation of Stalking Horse Bidder.

Debtor has designated the bid of Purchaser ("Stalking Horse Bidder") as the stalking horse bid ("Stalking Horse Bid"). As the Stalking Horse Bidder, Purchaser shall, upon entry of the Overbid Procedures Order, be entitled to the Topping Fee (as defined below), expense reimbursement and other standard stalking horse protections as discussed below. The obligation of Purchaser to perform under the APA is conditioned on, among other things, the entry of the Overbid Procedures Order by the Bankruptcy Court approving the Overbid Procedures, the Topping Fee and expense reimbursement.

B. Due Diligence Package. To obtain access to all material non-public information that has been or will be delivered to the Purchaser and any other bidder concerning the Purchased Assets and Assumed Obligations, each interested person or entity must deliver a written request along with a confidentiality agreement in the form attached to the Overbid Procedures as Schedule 1, as indicated in the Overbid Procedures. The phrase "material non-public information" includes, without limitation, the exhibits and schedules to the APA which shall not be filed with the Bankruptcy Court but will be made available to bona fide potential purchasers.

C. Auction Process

1. Auction Date. An in-person Auction shall be conducted on June 2, 2010 at 10:30 a.m. PST at the offices of Karr Tuttle Campbell, 1201 Third Ave., Ste. 2900, Seattle, Washington. To be eligible to participate in the auction, all bidders ("Competing Bidder) must prequalify.

2. Qualifications to Bid. Only Competing Bidders who qualify (as described below, the "Qualified Competing Bidders") shall be allowed to participate in the Auction. Purchaser shall be a Qualified Competing Bidder for all purposes hereunder.

---

extent there is a conflict between this summary and the terms of the Overbid Procedures, the Overbid Procedures shall govern.



Law Offices
KARR TUTTLE CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

To become a "Qualified Competing Bidder," each Competing Bidder shall, on or before 5:00 p.m. PST on May 27, 2010 ("Bid Deadline"), deliver a proposal ("Competing Proposal") to Diana K. Carey, Karr Tuttle Campbell, 1201 3rd Ave., #2900, Seattle, Washington 98101, (Fax: (206) 682-7100); e-mail: dcarey@karrtuttle.com), counsel for the Seller, and to Alan D. Smith, Perkins Coie LLP, 1201 Third Avenue, #4800, Seattle, Washington 98101 (Fax: (206 359-9410; email ADSmith@perkinscoie.com, counsel for Purchaser; which:

(i) clearly sets forth each component of the bid price, such total price to provide a greater return to unsecured creditors of the Company (or such other stakeholders as the Bankruptcy Court shall deem to be appropriate), taking into consideration the cash and non-cash components of the purchase price plus the necessary overbid amount described below. To the extent a Qualified Competing Proposal contains any non-cash consideration, the bidder shall provide a full description of such non-cash components and provide information sufficient for Seller to determine its present cash value.

(ii) shall be set forth in a written agreement containing terms and conditions that are at least as favorable to Seller as those set forth in the APA (such written agreement to be deemed a "Modified APA");

(iii) is made by a person financially qualified to consummate the Competing Proposal on a timely basis, and includes such financial and other information that will allow the Seller to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated, including performance under the Assumed Contracts;

(iv) is subject only to entry of an order approving the proposed transaction, with no other contingencies of any sort, including without limitation any environmental, shareholder, financing or due diligence contingencies or conditions, and is made by a person who has completed its due diligence review of Seller's books and records, and is satisfied with the results thereof;

(v) is accompanied by an initial deposit ("Initial Deposit") in the amount of Three Hundred Thousand Dollars ($300,000) to Company, by cashier's check or wire transfer (instructions to be provided upon request) which deposit shall become nonrefundable in the event that such bid is determined to be the "High Bid" as defined below;

(vi) acknowledges that the Competing Bidder may not request any Topping Fee, termination fee, expense reimbursement or similar type of payment, nor shall any Competing Bidder (other than the Purchaser).

3. Qualified Competing Bidders. The Debtor shall make a determination regarding whether a bid is a Qualified Competing Proposal and shall notify potential bidders whether their Competing Proposals have been determined to be

Qualified Competing Proposals by no later than 5:00 p.m. (prevailing Pacific time) on May 27, 2010, and will provide further bid instructions at that time**.** The Purchaser is deemed a Qualified Competing Bidder and the APA constitutes a Qualified Competing Proposal for all purposes. The Seller reserves the right to reject any bid other than the APA (even if such bid constitutes a Qualified Competing Proposal) if the Seller determines, in its sole discretion, that such Competing Proposal is inadequate or insufficient or the Seller determines, in its sole discretion, that such bid is not in conformity with the requirements of the Bankruptcy Code or any related rules, the terms set forth in the Overbid Procedures or contrary to the best interests of the Seller and its estate. Any party may seek the Court's review of the Seller's determination that a potential bidder is not a Qualified Competing Bidder; *provided*, *however*, that any such challenge must be raised and concluded prior to the commencement of the Auction. The Seller's determination of the Qualified Competing Bidders shall become irrevocable and unreviewable once the Auction has commenced.

4. No Qualified Competing Proposals. If no conforming Qualified Competing Proposals are received, the Debtor shall not hold an Auction and, instead, the Purchaser shall automatically be deemed the Winning Bidder and the Seller shall request at the Sale Hearing that the Court approve the APA with the Purchaser.

5. Opening Bid. The Stalking Horse Bid shall be considered the opening bid (the "Opening Bid") at the auction. For all purposes of these bidding procedures and the Auction contemplated herein, including, without, limitation, the determination of the Winning Bidder, the Opening Bid shall be valued at an amount equal to the cash component of six million dollars ($6,000,000) plus the Earnout of up to $4,000,000 (for a total of $10,000,000);

6. Overbid. The highest Overbid submitted by a Qualified Competing Bidder shall be the initial overbid at the auction (the "Initial Qualified Competing Proposal"), which shall be at least Two Hundred Fifty Thousand Dollars ($250,000) higher than the Opening Bid. Subsequent overbids (the "Subsequent Overbids") shall be in increments of not less than $100,000 higher than the immediately preceding bid. The Initial Overbid and Subsequent Overbids shall be on substantially the same or better terms and conditions, taking into consideration the cash and non-cash components of the purchase price as a whole, as those set forth in the Stalking Horse Bid. Purchaser shall be entitled to a credit equal to, the amount of the Topping Fee.

7. Winning Bidder: During the auction, the person who submits the highest bid will be deemed the Winning Bidder ("Winning Bidder"), taking into consideration the cash and non-cash components of the purchase price and the probability of closing the transaction. This will be deemed the "High Bid."



*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

8. The High Bid, as determined by Seller in accordance with these Bid Procedures, shall promptly be submitted to the Bankruptcy Court for approval at the Sale Hearing. By participating in the Auction, each bidder agrees that if it is the next highest bidder, its bid will remain open for five (5) business days after entry of an order by the Bankruptcy Court approving the sale to the Winning Bidder in order to consummate the sale of Purchased Assets if for any reason the sale to the party submitting the High Bid does not close.

9. Closing. Unless otherwise extended by Court order, the transaction evidenced by the High Bid shall close within three days after entry of the Sale Order (except with respect to Purchaser, which is governed by the time set forth in the APA), unless such order is stayed, (the "Closing Date") at which time the Winning Bidder shall pay the balance of the High Bid.

10. Failure to Perform. In the event a bidder is declared to be the Winning Bidder and such bidder fails to timely perform any of its obligations as set forth above or in its Modified APA, such declared Winning Bidder shall forfeit its Initial Deposit without regard to Seller's ultimate damages occasioned by such failure; and this shall not constitute liquidated damages; and, notwithstanding the foregoing, Seller and the bankruptcy estate shall retain all rights, remedies, claims, counterclaims, and defenses, including the right to seek equitable or injunctive relief.

11. Remedies if No Sale. In the event Seller is unable to obtain Court approval of the Sale Motion, the sole remedy of any bidder shall be of the return of its Initial Deposit except, with respect to Purchaser, as otherwise provided in the APA.

D. Topping Fee and Expenses

If this Agreement is terminated because Purchaser's bid is not the High Bid, but Seller consummates a transaction with the Winning Bidder or backup bidder, then Purchaser shall be delivered a topping fee equal to Two Hundred Twenty-Five Thousand dollars ($225,000) ("Topping Fee") which amount shall be paid within five (5) days of the date the sale to the Winning Bidder or backup bidder is approved by the Bankruptcy Court, and shall be paid solely from the purchase price paid by the Winning Bidder or backup bidder as part of such successful bidder's Qualifying Competing Proposal. In the event Purchaser purchases the Assets, Purchaser shall not be entitled to a topping fee under this provision. Purchaser shall also be reimbursed its



*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

expenses up to the amount of One Hundred Thousand Dollars ($100,000) ("Expense Reimbursement"). Any Topping Fee or Expense Reimbursement that becomes payable shall constitute a superpriorty claim with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

The proposed Overbid Procedures are in the best interests of Debtor, its creditors, and its estate. The Overbid Procedures are designed to strike a balance between inviting competing bids and enabling Debtor to close a sale with Purchaser within a reasonable time frame. The Overbid Procedures thus are fair, reasonable and necessary to promote the highest and best sale price, without imposing undue obstacles to the competitive bid process. Moreover, debtors often employ bidding protections in order to encourage the making of an original offer subject to higher and/or better offers and ultimately to increase value for the bankruptcy estate.

Here, the Topping Fee is an integral part of Purchaser's offer. In fact, Purchaser's offer to purchase the Purchased Assets was—and remains—predicated and conditioned upon, *inter alia*, this Court's approval of the Topping Fee. As such, the assurance of the Topping Fee has "promoted more competitive bidding" because it induced a bid from Purchaser that otherwise might not have been made. Debtor submits that Purchaser should be reasonably reimbursed for its willingness to assume the role of the Stalking Horse Bidder as it is the only party ready and willing to serve in such role. Moreover, Purchaser's offer (including the Topping Fee and Expense Reimbursement) is also likely to serve as a catalyst to higher bids. Accordingly, Debtor respectfully submits that this Court should authorize and approve the Overbid Procedures, including the Topping Fee and Expense Reimbursement.



*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

IV. LEGAL ANALYSIS

A. Conducting a Public Auction Pursuant to the Overbid Procedures Is in the Best Interests of the Estate and Its Creditors.

By this Sale Motion, Debtor seeks approval of the Proposed Asset Sale, free and clear of liens and encumbrances, as further detailed above and in the APA, subject to higher or better offers.

B. Bankruptcy Code § 363. section 363(b) of the Bankruptcy Code authorizes a debtor to sell its assets outside of the ordinary course of business. A debtor must show that each of the following elements has been met: (i) a sound business reason exists for the proposed transaction; (ii) the sale has been proposed in good faith; (iii) the sale price is fair and reasonable; and (iv) accurate and reasonable notice has been provided of the transaction.[5] Here, the proposed sale of the Purchased Assets pursuant to the APA meets each of these four factors.

C. The Proposed Sale Is Supported by Sound Business Reasons. Based upon analysis of its existing and future business prospects, the Debtor has concluded that, given its current, severe liquidity crisis and the absence of a source of capital for continued long-term operations, the Proposed Asset Sale represents the only viable way to maximize the value of Debtor's estate for the benefit of all creditors.

The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See, e.g., Four B. Corp. v. Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res., Inc., 147 B.R. 650, 659



Law Offices
KARR TUTTLE CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

(S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."). To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales. See In re Integrated Res., Inc., 147 B.R. at 659 (sales procedures should "encourage bidding and . . . maximize the value of the debtor's assets").

Here, the proposed Overbid Procedures will allow and encourage interested parties to submit competing bids in an auction, thereby maximizing the value that the Debtor will receive for its assets. The Debtor believes that the auction process will allow it to determine the highest and best price possible for its assets. Without a prompt sale, the value of the Debtor as a going concern will significantly diminish because of the Debtor's cash flow difficulties. The Debtor further submits that the Proposed Asset Sale will preserve the substantial goodwill of Debtor's business, maintain valuable relationships with customers, preserve jobs, and avoid a liquidation sale of Debtor's assets at severely depressed, "fire-sale" prices. Thus, Debtor believes that the Proposed Asset Sale will realize the most cash possible for Debtor's estate and creditors.

D. The Sale has Been Proposed in Good Faith. "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings." In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986). "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud,

---

[5] In re Country Manor of Kenton, Inc., 172 B.R. 217, 220-21 (Bankr. N.D. Ohio 1994); In re Stroud Ford, Inc., 163 B.R. 730 (Bankr. M.D. Pa. 1993); In re Plabell Rubber Prods., Inc., 149 B.R. 475, 479 (Bankr.. N.D. Ohio 1992); In re George Walsh Chevrolet, Inc., 118 B.R. 99, 102 (Bankr. E.D. Mo. 1990).



Law Offices
KARR TUTTLE CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." Id.

Here, the APA is the result of protracted, arm's length negotiations between Debtor and Purchaser, and their respective advisors. Purchaser thus is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and should be entitled to all of the protections thereof.

Additionally, the sale of the Purchased Assets is subject to higher or better offers and Debtor intends to provide notice of the Proposed Asset Sale to all potential bidders. Finally, Debtor has fully disclosed, and is requesting herein the Court's approval of, all of the terms and conditions of the Proposed Asset Sale and the Overbid Procedures. Accordingly, the sale of the Purchased Assets has been proposed, and is, in good faith.

E. The Purchase Price is Fair and Reasonable. The Debtor sought higher or better offers from other potential purchasers prior to commencement of this Chapter 11 case and the filing of this Motion. Based upon those efforts, Debtor believes that the Purchase Price is fair and reasonable, is the highest and best offer received to date for the Purchased Assets, and that the likely alternative to the Proposed Asset Sale is a forced liquidation, with a resulting loss of substantial value to the Debtor's estate.

Further, the Debtor submits that the payment of the Topping Fee in the event of an Alternative Transaction is fair and reasonable. Here, Purchaser has incurred and will continue to incur costs in continuing to make its offer available to Debtor. Purchaser has already incurred substantial out-of-pocket legal fees in conducting its due diligence and negotiating the APA. If another bidder appears and pays substantially more than Purchaser's offer, the Debtor will reap the benefits of Purchaser's first offer allowing for a higher subsequent offer. Indeed, courts have



*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

recognized that such fees are often a key component to significant sales conducted under section 363 of the Bankruptcy Code. See In re Integrated Res., Inc., 147 B.R. at 659-60 ("[Topping fees] are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the directors of a corporation have a duty to encourage bidding, [topping] fees can be necessary to discharge [such] duties to maximize values.").

The Ninth Circuit has yet to rule on the allowability of "topping fees." In the only case in the Ninth Circuit discussing topping fees, *In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. Az. 1994), the court determined that, although the debtor had entered into an agreement, the court had "the jurisdiction and responsibility to determine if the proposed [topping] fee, and the transaction as a whole, make economic sense for all concerned." *Id.* at 913. Most recently, the Third Circuit addressed the question of topping fees in *In re Reliant Energy Channelview L.P.*, 2010 WL 143678, reaffirming earlier decisions that a bidder's mere request for allowance of a topping fee does not mean that the topping fee is recoverable as a condition of the bid, without proof that it was necessary to preserve the value of the estate.

Here, the Topping fee reasonably relates to Purchaser's "risk, effort and expenses . . .", In re Integrated Res., Inc., 147 B.R. at 662, was the result of arms-length negotiations, In re 955 5th Avenue Associates, 96 B.R. 24 (Bankr. S.D.N.Y. 1989), and encourages bidding. Id. at 28. Thus, the Topping fee should be approved and allowed in the event of an Alternative Transaction.

F. The Requirements of 11 U.S.C. § 363(f). Section 363(f) of the Bankruptcy Code provides:

> (f) The Trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –



Law Offices
KARR TUTTLE CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

> (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Here, the requirements of section 363(f) are met regarding all property to be sold by the Debtor, including intangible property rights. Finally, in the absence of an objection by any purported holders of claims and interests in any property sold by the Debtor constitutes consent to the sale free and clear of such claims and interests.

F. <u>The Successful Bidder Is Entitled to Good Faith Purchaser Status Pursuant to section 363(m) of the Bankruptcy Code</u>.

The Debtor requests that the Court find that the Successful Bidder is qualified to acquire the Purchased Assets and will do so in good faith within the meaning of Bankruptcy Code section 363(m). Specifically, section 363(m) provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . . ." 11 U.S.C. § 363(m). Thus, pursuant to this section, "an appeal of a bankruptcy court's ruling on a foreclosure action [or sale] generally cannot affect the rights of a good faith purchaser of the foreclosed property." <u>Mann v. Alexander Dawson, Inc.</u>, 907 F.2d 923,926 (9th Cir. 1990).



*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Here, Purchaser needs assurance that the purchase of the Purchased Assets will not be subject to future attack by objecting creditors. Such assurance, Debtor believes, is required to generate the maximum purchase price for such assets at the Auction. Further, these circumstances warrant a finding of good faith on the part of Purchaser. Lack of good faith is generally determined by the existence of fraudulent conduct or insider dealing during the sale process. See In re Exennium, Inc., 715 F.2d 1401 (9th Cir. 1983). Here, no such fraudulent conduct or dealings have occurred as of the date of this Sale Motion and will not occur prior to the Sale Hearing. Further, the Proposed Asset Sale here will be the product of an open auction subject to Court approval and to the extent necessary, arms-length, good faith negotiations between the Debtor, on the one hand, and the Successful Bidder, on the other.

## V. PROPOSED NOTICE OF PROPOSED ASSET SALE AND PROCEDURES

Debtor is sending a set of the Sale Motion and its supporting documents to all known creditors, taxing authorities, etc. via mail, as well as notifying parties via ECF. In addition, in order to ensure broad dissemination of notice of the final Overbid Procedures, upon entry of the Overbid Procedures Order, Debtor proposes to serve the Overbid Procedures Order with its proposed notice of sale ("Notice of Sale") on all (i) creditors, equity holders and prospective bidders (or their counsel) that are known to the Debtor and their advisors; (ii) counsel to the Creditors' Committee; (iii) taxing authorities; (iv) counsel to the Purchaser; (v) all parties known to the Debtor to have asserted any lien, claim, encumbrance or other interest in any of the Purchased Assets; (vi) the Office of the United States Attorney; (vii) the Attorney General for the State of Washington; and (viii) all persons who have filed requests for notice in this chapter 11 case.



Law Offices
KARR TUTTLE CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

The Debtor respectfully submits that such notice of sale of the Purchased Assets satisfies the notice requirements of the applicable Bankruptcy Rules and section 363(b) of the Bankruptcy Code, constitutes good and sufficient notice, and that no other or further notice of this Sale Motion, the Proposed Asset Sale, or the APA is required.

VII. CONCLUSION

Based on the foregoing, the Debtor respectfully requests that this Court (i) at the conclusion of the initial hearing on the Sale Motion, (a) enter the Overbid Procedures Order substantially in the form attached hereto as Exhibit A, and (b) approve the forms of the Bid Procedure and Sale Notice attached as Schedules 1 and 2 to the Overbid Procedures Order; (ii) at the conclusion of the Sale Hearing, enter the Sale Order substantially in the form attached hereto as Exhibit B; and (iii) grant such related relief as requested herein.

DATED this 16th day of April 2010.

KARR TUTTLE CAMPBELL

Diana K. Carey

Diana K. Carey, WSBA #16239
Attorneys for Debtor-in-Possession,
QL2 Software, Inc.



Law Offices
KARR TUTTLE CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100