The Honorable Karen A. Overstreet

Chapter 11
Hearing Location: 700 Stewart St., Rm. 7206
Confirmation Hearing Date: August 6, 2010
Hearing Time: 11:00 a.m.
Response Date: July 30, 2010, 5:00 p.m.

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

In re

In re QL2 SOFTWARE, INC.,

Debtor.

Case No. 10-10209- KAO

DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S AND SPONSOR'S FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED AS OF JULY 2, 2010

IMPORTANT: THIS DISCLOSURE STATEMENT CONTAINS INFORMATION RELATED TO THE DEBTOR'S AND SPONSOR'S FIRST AMENDED JOINT CHAPTER 11 PROPOSED PLAN OF REORGANIZATION. PLEASE READ THIS DOCUMENT WITH CARE. THE INFORMATION CONTAINED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCE OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE OR INCLUDE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY PERSONS DESIRING ANY SUCH ADVICE SHOULD CONSULT THEIR OWN ATTORNEYS OR ADVISORS.

MANAGEMENT OF THE DEBTOR, EXCEPT WHERE OTHER SOURCES ARE IDENTIFIED, HAS SUBMITTED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR AUTHORIZES NO REPRESENTATIONS CONCERNING IT OR THE PLAN OTHER THAN THOSE IN THIS DISCLOSURE STATEMENT AND ACCOMPANYING DOCUMENTS. YOU SHOULD NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PARTY TO SECURE YOUR VOTE OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT. NO OTHER PERSON IS AUTHORIZED TO MAKE ANY REPRESENTATIONS ON BEHALF OF THE DEBTOR. THE DEBTOR HAS USED CARE TO SET FORTH THE INFORMATION IN THIS DISCLOSURE STATEMENT ACCURATELY AND COMPLETELY IN ALL MATERIAL RESPECTS. HOWEVER, DEBTOR CANNOT AND DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY. IN PARTICULAR, EVENTS AND FORCES

DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S PLAN OF
REORGANIZATION - 1
#753776 v1 / 40548-002

72967-0001/LEGAL18659996.1

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

BEYOND THE CONTROL OF THE DEBTOR MAY ALTER THE ASSUMPTIONS UPON WHICH THE FEASIBILITY OF THE PLAN IS SUBJECT.

THE DEBTOR MAY CONTINUE TO NEGOTIATE PAYMENT TERMS WITH ITS CREDITORS, AND THE SPECIFIC TREATMENT OF CLAIMS MAY CHANGE AS A RESULT, BUT THE DEBTOR BELIEVES THAT THE PAYMENT TERMS WHICH IT WILL ASK THE COURT TO APPROVE WILL NOT BE LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

TO ALL PARTIES IN INTEREST:

On January 11, 2010, QL2 Software, Inc. ("*QL2*", "*Debtor*" or "*Company*") filed its petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor is presently acting as debtor in possession. The Debtor's reorganization case is pending before the above-captioned court. This Disclosure Statement is submitted by the Debtor and Copernicus Holdings LLC, an investment vehicle of DMEP Corporation d/b/a/ Hale Global ("*Sponsor*" and with Debtor, "*Proponents*"). This Disclosure Statement contains information with respect to Debtor's and Sponsor's proposed First Amended Joint Plan of Reorganization dated as of July 2, 2010 (the "*Plan*").

Pursuant to § 1125 of the Bankruptcy Code, this Disclosure Statement is being distributed to you along with a copy of the proposed Plan to allow you to make an informed decision in exercising your right to accept or reject the Proposed Plan. This Disclosure Statement has been approved by order of the Court pursuant to § 1125 of the Bankruptcy Code as containing information of a kind, and in sufficient detail, as far as is reasonably practicable under the circumstances, that would enable a hypothetical reasonable investor to make an informed judgment about the Plan. In the event of inconsistencies between the Plan and the Disclosure Statement, however, the terms of the Plan shall control. The Court's approval of this Disclosure Statement does not constitute an endorsement of the proposed Plan by the Court.

THE ONLY REPRESENTATIONS THAT ARE AUTHORIZED OR THAT MAY BE MADE CONCERNING THE DEBTOR, THE VALUE OF ASSETS, OR THE PLAN ARE CONTAINED IN THIS DISCLOSURE STATEMENT. THE FINANCIAL INFORMATION CONTAINED HEREIN OR INCORPORATED BY REFERENCE HAS BEEN PREPARED BY THE DEBTOR'S MANAGEMENT AND IS EFFECTIVE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE READER SHOULD NOT INFER OR ASSUME THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. FINANCIAL INFORMATION, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, IS NECESSARILY BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE AND PRUDENT BY MANAGEMENT, MAY NOT BE REALIZED AND WILL REMAIN SUBJECT TO INHERENT UNCERTAINTIES. THE FINANCIAL INFORMATION HAS NOT BEEN SUBJECTED TO AN AUDIT AND FOR THAT REASON THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACY. HOWEVER, GREAT EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY REPRESENTED.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

The Debtor and Sponsor urge you to accept the proposed Plan and to promptly return your completed ballot to enable your vote to be counted.

# ARTICLE 1
## DEFINITIONS AND RULES OF INTERPRETATION

### 1.1 Definitions

In addition to such other terms as are defined in the Plan or other sections of the Disclosure Statement, the following terms (which appear in the Plan and the Disclosure Statement as capitalized terms) have the following meaning as used in the Plan and Disclosure Statement:

"*Administrative Bar Date*" means the date to be established by the Bankruptcy Court as the last date to file Administrative Claims.

"*Administrative Claim*" means a Claim for costs and expenses of administration allowed under Section 503(b) of the Bankruptcy Code and referred to in Section 507(a)(2) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating Debtor's business (such as wages, salaries or commissions for services); (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under Sections 330(a) or 331 of the Bankruptcy Code; and (c) all fees and charges assessed against the Estate under 28 U.S.C. § 1930.

"*Allowed Amount*" means the amount of any Claim that becomes an Allowed Claim.

"*Allowed Claim*" or "*Allowed _____ Claim*" or "*Allowed Interest*" means a Claim or Interest against Debtor (in the particular category as appropriate) to the extent that:

(a)(i) a proof of claim (or Interest) was timely filed with the Bankruptcy Court on or prior to the Bar Date or Administrative Bar Date, as applicable; or (ii) is deemed timely filed under applicable law or by reason of an order of the Bankruptcy Court; and

(b)(i) Debtor or Reorganized QL2 (or, if permitted under applicable law, another party in interest) does not file an objection within a time fixed by the Bankruptcy Court and the Claim is not otherwise a Disputed Claim (but only to the extent that such Claim is not a Disputed Claim); (ii) the Claim (or Interest) is allowed (and only to the extent allowed) by a Final Order; or (iii) the Claim (or Interest) is allowed under the Plan.

"*APA*" has the meaning set forth in Disclosure Statement Section 2.4.1.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**"Avoidance Action"** means any action brought under Sections 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, and any comparable provision of applicable state law.

**"Bankruptcy Code"** or **"Code"** means Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as now in effect or hereafter amended. All citations in the Plan to section numbers are to the Code unless otherwise expressly indicated.

**"Bankruptcy Court"** or **"Court"** means the United States Bankruptcy Court for the Western District of Washington, Seattle Division, or, if such court ceases to exercise jurisdiction over the Chapter 11 Case, the court or adjunct thereof that exercises jurisdiction over the Chapter 11 Case in lieu of such court.

**"Bankruptcy Rules"** or **"Rules"** means, collectively (a) the Federal Rules of Bankruptcy Procedure and (b) the Local Bankruptcy Rules for the Bankruptcy Court, as now in effect or hereafter amended.

**"Bar Date"** means May 28, 2010, as established by the Bankruptcy Court pursuant to Order Waiving Case Management Conference and Setting Deadlines entered by the Bankruptcy Court on January 29, 2010.

**"Borcich"** is Vincent Borcich, a former member of the board of directors of QL2.

**"Business Day"** means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**"Chapter 11 Case"** means the within Chapter 11 proceeding known as Case No. 10-10209, pending before the Bankruptcy Court.

**"Claim"** means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured or unsecured; or, a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right is an equitable remedy or is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, matured, disputed, undisputed, secured or unsecured.

**"Class"** means any grouping into which Allowed Claims and Interests are classified pursuant to Article 2 of the Plan.

**"Committee"** means the Official Committee of Unsecured Creditors appointed in the Case by the United States Trustee.

**"Conditions to Effectiveness"** are certain conditions precedent to reaching the Effective Date of the Plan that must be satisfied or waived by Proponents, as defined in Plan Section 4.1.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

"**Confirmation**" means the entry by the Bankruptcy Court of the Confirmation Order.

"**Confirmation Date**" means the date upon which Confirmation occurs.

"**Confirmation Hearing**" means the hearing held before the Court respecting Confirmation of the Plan.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under Section 1129 of the Bankruptcy Code.

"**Creditor**" means a person or entity holding an Allowed Claim.

"**Debtor**" is QL2 Software, Inc.

"**DIP Facility**" means the debtor-in-possession financing facility to be provided by Sponsor provided pursuant to that certain Debtor in Possession Loan and Security Agreement pursuant to which Sponsor has agreed to provide up to $500,000 of term loans or other credit support. The DIP Facility includes $100,000 already funded to the Debtor and approved by the Bankruptcy Court pursuant to an order entered on May 14, 2010 in the Chapter 11 Case.

"**Disclosure Statement**" is defined in the Introduction to this document.

"**Disputed Claim**" means a Claim (a) which is scheduled as disputed, contingent, or unliquidated, or (b) as to which a proof of claim has been filed or deemed filed under applicable law, as to which an objection has been or may be timely filed by Debtor or any other party in interest and which objection, if timely filed, has not been withdrawn on or before any date fixed for filing such objections by the Plan or Order of the Bankruptcy Court and has not been overruled or denied by a Final Order. The term Disputed Claim also includes any Claim that Reorganized QL2 believes may be appropriately objected to, whether or not such objection has yet been filed, so long as the objection period set forth in Plan Section 3.4(c) has not expired. For the avoidance of doubt, for purposes of objections to Claims, Sponsor shall be a party in interest with standing and ability to object to any Claim it deems objectionable.

"**Distribution**" means a distribution of money or property by Reorganized QL2 to Creditors in accordance with the Plan.

"**Effective Date**" means the first Business Day which is more than fourteen (14) days after the Confirmation Date, provided that (a) there is no appeal pending from the Confirmation Order or, if an appeal has been filed, there is no stay pending appeal then in effect, and (b) that all Conditions to Effectiveness have been satisfied or waived by Proponents.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**"Estate"** means the estate created in the Chapter 11 Case for the Debtor under Section 541 of the Bankruptcy Code.

**"Executory Contract Motion"** has the meaning set forth in Section 2.4.1.

**"Final Decree"** means an order closing the Chapter 11 Case entered in accordance with Rule 3022.

**"Final Distribution"** means the last contemplated Distribution to be made by Reorganized QL2 to General Unsecured Creditors in accordance with the Plan, as described in Plan Section 3.4(b).

**"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the Court's docket, which has not been reversed, stayed, modified or amended, and as to which (i) the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely filed, or (ii) any appeal that has been or may be taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

**"General Unsecured Claims"** means the amounts of those Claims against the Debtor for which there are no assets of the Debtor serving as security, but not including any Priority Claims.

**"General Unsecured Creditors"** means Creditors holding Allowed General Unsecured Claims.

**"Initial Distribution"** means the first Distributions to be made by Reorganized QL2 to General Unsecured Creditors and others at or as soon as practicable after the Effective Date pursuant to Plan Section 3.4(a).

**"Interest"** means an equity interest in Debtor. Debtor has two classes of stock outstanding, Old Common and Old Preferred.

**"Interest Holder"** means the holder of an Allowed Interest in Debtor.

**"Interim Distribution"** means all Distributions other than the Final Distribution, including the Initial Distribution.

**"Liquidation Preference"** is defined in Plan Section 2.2(h).

**"New Common"** means the common units in Reorganized QL2 to be issued to Sponsor pursuant to Plan Section 2.02(a).

**"New Common Unitholders"** means the holders of units of New Common.

**"New Preferred"** means the preferred units in Reorganized QL2 to be issued to Old Common Shareholders on the Effective Date.

DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S PLAN OF REORGANIZATION - 6
#753776 v1 / 40548-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

"*New Preferred Unitholders*" means the holders of units of New Preferred.

"*Old Common Shareholders*" means the holders of shares of Old Common immediately prior to the Effective Date.

"*Old Common*" means the shares of common stock in Debtor immediately prior to the effective date.

"*Old Preferred Shareholders*" means the holders of shares of Old Preferred immediately prior to the Effective Date.

"*Old Preferred*" means the Series A Preferred Stock existing immediately prior to the Effective Date.

"*Order*" means an order or judgment of the Bankruptcy Court as entered on its docket.

"*Original Preferred Face Amount*" is defined in Plan Section 2.2(h) and in the Disclosure Statement at Section 4.4.8.

"*Petition Date*" is January 11, 2010.

"*Plan*" is the Debtor's and Sponsor's Joint Chapter 11 Plan of Reorganization.

"*Plan Documents*" means the Plan, the Disclosure Statement, and all documents executed and delivered by Proponents in connection therewith, including any exhibits, schedules, amendments, modifications, and supplements thereto.

"*Plan Rate*" means twelve percent (12%) per annum or, if applicable, the contract rate.

"*Plan Supplement*" means the pleading to be filed by Debtor no later than twenty-one (21) calendar days prior to the date votes on the Plan are due, including such ancillary documents as forms of deeds of trust, promissory notes, loan agreements, and other such instruments described in the Plan, in the Disclosure Statement, or otherwise as Proponents may determine are appropriate.

"*Priority Claim*" means a Claim which, if allowed, would be entitled to priority pursuant to Sections 507(a)(2), (3), (4), (5), or (7) of the Bankruptcy Code.

"*Priority Tax Claim*" means a Claim which, if allowed, would be entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**"Professional Fees"** means fees and costs incurred by professionals employed by the Estate (attorneys, accountants, real estate brokers, and others) pursuant to Orders of the Bankruptcy Court (**"Professionals"**).

**"Proponents"** means the Debtor and Sponsor.

**"Rejected Contracts"** has the meaning set forth in Disclosure Statement Article 6.

**"Rejection Claim"** means an Allowed Claim for damages arising under Section 502(g) of the Bankruptcy Code solely as the result of the rejection of an executory contract or unexpired lease. The term Rejection Claim does not include any other claims or interests of the holder of such Allowed Claim, including without limitation any claims existing as of the Petition Date and any Administrative Claims.

**"Reorganized QL2"** means Debtor on and after the Effective Date. As described in Plan Section 3.1, at the Effective Date Debtor will merge into a new Delaware limited liability company and the merged entity will be for all purposes of the Plan Reorganized QL2.

**"Sale Motion"** has the meaning set forth in Disclosure Statement Section 2.4.1.

**"Secured Claim"** means a Claim which, if allowed in the priority scheduled by the Debtor or asserted by the claimant, would be secured by a lien, security interest or other charge against the property in which the Estate has an interest, or which is subject to set-off under Section 553 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such secured Claim in the Estate's interest in such property, or to the extent of the amount subject to any set-off, as the case may be.

**"Sponsor"** is Copernicus Holdings LLC, an investment vehicle of DMEP Corporation d/b/a/ Hale Global.

**"Sponsor Equity Contribution"** means the cash equity contribution in the amount of $2,000,000 to be made by Sponsor to Reorganized QL2 pursuant to the Plan. Except as set forth in the definition of Sponsor Exit Facility, the total of the Sponsor Equity Contribution and the Sponsor Exit Facility shall not exceed $4,000,000, including any credit issued and outstanding under the DIP Facility.

**"Sponsor Exit Facility"** means the amount of up to $2,000,000 to be loaned by Sponsor to Reorganized QL2 pursuant to that certain Loan and Security Agreement to be dated as of the Effective Date, including credit issued and outstanding under the DIP Facility as of the Effective Date. Such amount may be increased up to an additional $1,000,000 at the discretion of the Reorganized QL2 Board of Managers. All amounts loaned under the Sponsor Exit Facility shall be secured by essentially all assets of Reorganized QL2 as provided in the Loan and Security Agreement. Such security shall be a first priority security interest subject only to the rights, if any, of the holder(s) of Class 2 Claims and Class 3 Claims pending payment of such Allowed Claims. Except as set forth above, the total of the Sponsor Equity Contribution and the Sponsor Exit Facility shall not exceed $4,000,000, including any

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

credit issued and outstanding under the DIP Facility. Sponsor will be entitled to a loan fee on account of the Sponsor Exit Facility of $100,000, less any loan fees paid on account of the DIP Facility, plus reimbursement of expenses incurred in connection with the financing.

"***Tumelson Adversary Proceeding***" means Adversary Proceeding No. 10-01028-KAO pending before the Bankruptcy Court.

"***Tumelsons***" means the Tumelson Family Limited Partnership, Katie Taylor and Kelly Tumelson.

"***Tumelson Secured Claim***" has the meaning set forth in Plan 2.02(b).

## 1.2   Other Defined Terms

Any term used in the Disclosure Statement that is not defined in the Disclosure Statement or Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules.

## 1.3  Rules of Interpretation.

For purposes of the Plan and this Disclosure Statement:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any references in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified in a particular reference, all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (e) the words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; and (g) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply.

## ARTICLE 2
## BACKGROUND INFORMATION

QL2 is a Washington corporation that provides its customers access, through an automated data gathering process, to necessary competitive pricing and product data. QL2 was founded in 2002. QL2 has two wholly owned foreign subsidiaries, QL2 Software (India) Private Limited, and QL2 Europe LTD.  QL2 has more than 220 customers in 40 countries, including nine Fortune 50 companies. The QL2 client roster includes more than 90 airlines, three of the top five global pharmaceuticals, and market leaders in retail, consumer products, and life sciences. Its revenue has been increasing - $7.4M

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

in 2007, $11.1M in 2008, and $11.3M in 2009. As of the date of this Disclosure Statement, QL2 employs 143 people, including 34 in Seattle, nine in Atlanta, three in London, and 97 in India.

## 2.1    Factors Leading to Chapter 11

In late 2008, QL2 anticipated raising private capital during the first half of 2009, based on optimistic revenue projections. However, by late 2008, the global economy soured and many of the projects anticipated from existing customers and those in its pipeline were delayed. The company was also faced with two lawsuits, including one by the Tumelsons, as discussed below. Venture capital firms approached by QL2 delayed their decision or passed altogether because they could not assess the condition of the business. By mid-2009, QL2 found itself without source of third-party capital, revenue short of projections, and the need to lay off employees instead of having resources for expansion. QL2 was in survival mode from June to December 2009, revising its revenue forecasts downward significantly several times over the course of 2009. To date, the headcount has been reduced by a total of 21 employees since January 2009. The fact that the Company was in a downturn, did not have reliable financials, could not raise capital, and was looking at uncertain sales growth, also lessened the possibility of getting a line of credit from a traditional lending source.

In late 2009, in the absence of a line of credit, limited cash resources, and faced with scheduled obligations to creditors, QL2's management determined that QL2 could not survive the next several months as an ongoing concern and closing the business entirely was a likely outcome. QL2 therefore decided to proceed with a Chapter 11 filing so it could seek relief from its financial obligations to stabilize the Company's operations, while it evaluated various options, including reorganization or a sale of its assets.

On January 11, 2010, QL2 filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code. Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, QL2 has retained possession of its assets and is authorized, as debtor and debtor-in-possession, to continue the operation and management of its business. No request has been made for the appointment of a trustee or examiner. An Unsecured Creditors Committee has been appointed in this case. The Bar Date for filing claims was established by the Court as May 28, 2010.

## 2.2    Dispute with Tumelsons.

2.2.1.   <u>Tumelson Litigation</u>.    The obligations incurred from ongoing litigation with the Tumelsons negatively affected Debtor's cash flow prior to the Petition Date. In 2005, the Tumelsons were awarded a judgment against Kelvin Chin (a former officer and director of QL2) for securities fraud and common law fraud, in connection with his involvement in another company.

(a)    In March 2008, the Tumelsons brought a claim in state court against QL2 and Vincent Borcich under the Uniform Fraudulent Transfer Act, RCW 19.40, alleging that QL2 and Borcich conspired to prevent the Tumelsons from collecting their judgment against Chin, including the Tumelsons' efforts to execute on Chin's stock in QL2.

#753776 v1 / 40548-002

72967-0001/LEGAL18659996.1

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

(b)     In August, 2009, the Tumelsons and Debtor and others engaged in a mediation seeking to resolve claims asserted by the Tumelsons against the Debtor and others.  As a result of that mediation, the Debtor agreed to pay the Tumelsons $730,000 plus interest in a series of payments commencing September 2009 and also agreed to grant the Tumelsons a security interest in certain assets of the Debtor as security for those payments

(c)     Subsequent to the mediation, neither the September 2009 payment, nor the security interest to be granted by the Debtor, actually occurred.  The matter was submitted to the mediator for resolution and on October 2, 2009, the mediator, designated as an arbitrator, entered an award in favor of the Tumelsons reflecting the terms of the August mediation.

(d)     On October 23, 2009, King County Superior Court Judge William Downing entered an Order Confirming Arbitration Award and Judgment, and entered judgment in favor of the Tumelsons and against the Debtor, in the amount of $730,000, plus reasonable attorneys' fees.

(e)     On November 13, 2009, Judge Downing entered an Order (1) Requiring that QL2 Issue a Stock Certificate to Tumelsons for 750,000 shares of QL2 Common Stock; and (2) Granting Tumelsons a First Position Security Interest in QL2's Accounts Receivable.  In the November 13, 2009 Order, the Court ordered that QL2 issue the shares and grant the security interest within five days of the Order.  The Tumelsons proceeded to garnish QL2's bank accounts, which led the parties to negotiate further.

(f)     As part of the exchange for releasing the garnishment, on November 16, 2009, the Tumelsons and Debtor entered into a Settlement and Release Agreement ("Agreement") to supersede the mediation agreement reached in August, 2009 and reflected in the October 23 Superior Court Order. Under the terms of the Agreement, the Debtor agreed to make cash payments to Tumelsons, and grant a first position security interest to the Tumelsons in Debtor's accounts receivable as security for the agreed cash payments, and also grant a first position security interest in Patent No. 7418440 owned by the Debtor.  The Debtor also agreed to issue 750,000 shares in the Debtor to Tumelsons, although there is a dispute over whether those shares are in addition to the monetary award or are to be issued merely as security for the monetary award. The Tumelsons settled with Borcich but the claims between QL2 and Borcich have not been resolved.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

(g)     In accordance with the Settlement and Release Agreement, on November 19, 2009, the Tumelsons filed a UCC-1 financing statement reflecting a security interest in the Debtor's accounts, including without limitation all accounts receivable, general intangibles, Patent No. 7418440, 750,000 shares of the common stock of QL2 Software, Inc., and all proceeds from the above described collateral under UCC Filing No. 2009-323-2585-5.

(h)     Also in accordance with the Settlement and Release Agreement, the Debtor issued 750,000 shares of its stock to Defendants Katie Taylor and Kelly Tumelson under Share Certificate No. 4040 on November 16, 2009, which shares are held by Richard Manning in trust.

2.2.2.   <u>Tumelson Claim</u>.  The Tumelsons claim both an interest in the 750,000 shares of stock and a remaining monetary claim of $480,000, plus a liquidation bonus and other fees and costs. They assert that the liquidation bonus of 120% was an agreed concession for them to reduce the amount of their claim in August, such that they would receive the remaining amount owing to them upon the sale or refinance of QL2.  The Tumelsons filed an amended Proof of Claim on May 13, 2010 alleging that they were owed $907,228.49 ("Tumelson Secured Claim"), including principal amount of $480,000, pre and post-petition interest of $71,632.03, attorneys' fees of $204,431.71, and a liquidation bonus of $151,204.75.

2.2.3.   <u>Tumelson Adversary Proceeding</u>.  The Debtor filed the "Tumelson Adversary Proceeding"), alleging that the secured interests should be avoided as preferential transfers pursuant to 11 U.S.C. § 547, which the Tumelsons dispute. Tumelsons also allege as a defense that the Debtor was solvent at the time of the transfers.  The Tumelson Adversary Proceeding has been stayed by the Court. The Committee has also alleged that the Tumelson Secured Claim may be subject to subordination under 11 U.S.C. § 510(b), which the Tumelsons dispute, and that the liquidation bonus should be rejected as a disguised penalty.

2.2.4.   <u>Tumelsons' Treatment Under the Plan.</u>  The Tumelsons have vigorously participated in the bankruptcy proceeding as well as defending against the Tumelson Adversary Proceeding, and have filed numerous motions as well as objecting to motions filed by the Debtor.  In an effort to resolve the dispute with the Tumelsons without further litigation, the Plan proposes a settlement in full of all issues relating to the Tumelsons, as described more fully in Section 2.2(b) of the Plan and in the Disclosure Statement at Section 4.4.2.  The Plan proposes that on the Effective Date, in full satisfaction of the Tumelson Secured Claim the Tumelsons will receive: (a) cash in the amount of $650,000; and (b) the 750,000 shares currently held in escrow, which shall be deemed Allowed Interests.  The Tumelsons will be Old Common Shareholders and will be treated as a member of Class 8 with respect to the 750,000 shares of Old Common.  The Tumelsons have agreed to sell their shares to Sponsor for $150,000.

In evaluating this Settlement, the Debtor believes that it is a fair compromise of the Tumelson Secured Claim. While the Debtor asserts that it has a meritorious preference claim, it would be costly to litigate whether or not the Debtor was insolvent on the date of the transfer of the security interests, and there would undoubtedly be additional discovery required. In any event, because the Plan contemplates payment in full of all unsecured claims, it is not relevant whether or not the Tumelson Secured Claim

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

should be avoided as a preference. It is unclear whether the "liquidation bonus" was a disguised penalty and thus unenforceable, as claimed by the Committee, or, as claimed by the Tumelsons, a negotiated reduction of their claim. Debtor believes that the negotiated reduction of the Tumelson Secured Claim reflects an appropriate reduction in the Tumelsons' alleged attorneys' fees. Further, it is unclear whether, pursuant to Judge Downing's November 13, 2009 order (which QL2 did not appeal), the Tumelsons would still be entitled to the 750,000 shares as they claim, even if the Agreement was voided as a preference The Debtor appreciates the Committee's contentions with respect to subordination of the Tumelsons' claims, but acknowledges that it would be a difficult burden to demonstrate that the Tumelsons' monetary claim is a claim "arising from . . . damages from the purchase or sale of [a] security" as required by Bankruptcy Code Section 510(b). The proposed Tumelson Settlement in the Plan removes the cost and uncertainty of further litigation.

For these and other reasons, the Debtor believes that the standard for approval of settlements under *In re A&C Properties*, 784 F.2d 1377 (9th Cir. 1986) has been satisfied, although it is not at all clear that the same standard would apply to settlements embodied in a plan of reorganization. such as the settlement with the Tumelsons as set forth in the Plan.

The Plan will also act as a release, effective as of the Effective Date, of any claims, causes of action, or rights of any nature whatsoever Debtor, Reorganized QL2, or the Estate may have, against the Tumelsons.

## 2.3 Other Events Since Bankruptcy Filing

2.3.1. <u>Post-Petition Cash Collateral.</u> The Debtor brought motions for authority to use the cash collateral of Graham and Dunn PC ("*Graham & Dunn*") and the Tumelsons pursuant to cash budgets. The Court approved the Debtor's use of cash collateral through June 30, 2010.

2.3.2. <u>Other "First Day" Motions</u>. In addition to issues relating to post-petition use of cash collateral, the Debtor brought "First Day" motions for authority to pay payroll and benefits and continued use of bank accounts and cash management system, all of which were granted pursuant to Orders entered by the Court.

2.3.3. <u>Employment of Professionals</u>. The Court authorized the employment of the following professionals in this case:

a. <u>Bankruptcy Counsel</u>: The Court authorized the employment of Karr Tuttle Campbell as counsel for the Debtor.

b. <u>Financial Consultant</u>: The Court authorized the Debtor's employment of Charles Brent Hall as financial consultant to the Debtor for purposes of insolvency analyses.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

c.   <u>Accountant to the Debtor</u>: The Court authorized the employment of PKM Associates as accountants to the Debtor for the purpose of preparing tax returns. Debtor has now completed its tax returns for 2006-2009.

d.   <u>Board Consultant:</u> The Court authorized the employment of Brian Vincent as board consultant, which employment terminated when Mr. Vincent became the debtor's Interim CEO.

e.   <u>Special Counsel</u>: The Court authorized the employment of Graham & Dunn as special counsel to the Debtor for corporate matters.

f.   <u>Committee Counsel</u>: The Court authorized the employment of Bullivant Houser Bailey to represent the Committee of Unsecured Creditors.

g.   <u>Financial Adviser to Committee</u>. The Court authorized the employment of Kent Mordy of Mordy Consulting, PC, as financial adviser to the Committee.

2.3.4. <u>Lease Rejections</u>. Debtor moved for rejection of its office lease with 403 Westpark Court in Peachtree City, Georgia, effective February 12, 2010. The order granting rejection was entered by the Court on March 5, 2010. Debtor's lease at its premises in Pioneer Square was rejected by operation of law, although Debtor continues to negotiate with the landlord, Burke State Building, LLC., regarding a new lease.

2.3.5. <u>Financial Performance during Chapter 11</u>. Attached hereto is Debtor's monthly report filed with the U.S. Trustee's Office and with the Bankruptcy Court (Docket No. 267) for the Month of May 2010 which reflects that Debtor had a net income of $150,131 based on revenues of $1,146,016 (13.1%) and the balance sheet reflects that the debtor had $682,578 of cash in the bank. However, Debtor anticipates that without additional financing, this working capital position will continue to fluctuate greatly. Therefore, the Debtor will likely require some form of credit facility prior to the Effective Date in order to maintain operations without interruption. The financials while improving, are still very uncertain, and it is highly likely that the lapsed revenues are materially incorrect from a GAAP perspective. Further, during the May time period, the debtor received a very large order, which has accounted for the bulk of the positive financial performance. The Company continues to service its current customer base, negotiate renewals and attract new customers. The Debtor has not been in a position to allocate resources to new markets, products or campaigns. Notwithstanding those challenges, however, Debtor has been able to close one significant new customer.

## 2.4   <u>Marketing of Assets/Proposed Sale.</u>

Since the bankruptcy filing, the Debtor made substantial efforts to market and sell its business as a going concern. The Debtor actively sought a suitor and received numerous inquiries, including two letters of intent. QL2 entered into negotiations with both entities, with respect to both a proposed sale and a proposed DIP Facility. In February 2010, when QL2 was evaluating its options between a sale of assets or a plan of reorganization, the Company was in desperate need of cash, the liabilities

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

were not well understood, and the financial reporting and controls were in disarray. QL2's Board of Directors decided the shortest path to resolution and the most economic from the point of view of administrative costs was to pursue a sale of assets pursuant to Section 363 of the Bankruptcy Code. As a result of new financial controls put in place and improved cash management techniques, QL2 decided not to pursue the DIP Facility but to move expeditiously for sale of the assets. The Company demonstrated the ability to generate cash and continued to gain control over its liabilities as well as a better understanding of potential claims.

2.4.1. <u>Proposed Section 363 Sale</u>. Initially the Debtor opted to negotiate with one of the two potential suitors, but after eight weeks of negotiation and no firm offer in sight, the Debtor reopened negotiations with the other suitor, DMEP corporation d/b/a/ Hale Global or its designee, assignee or nominee ("*Hale*"). On April 8, 2010, Hale entered into a purchase and sale agreement ("*APA*") with QL2, as later amended, that provided at least a $2.5 million cash payment among other consideration for the purchase of QL2's assets. In conjunction with entering into the APA, QL2 submitted overbid procedures, which were approved by this court on April 30, 2010, for conducting an auction to be held on June 2, 2010. The sale was noted for approval on June 7, 2010, pursuant to Section 363 of the Bankruptcy Code ("***Sale Motion***"), and the Debtor subsequently filed a motion to assume and assign executory contracts and leases and to reject certain other executory contracts or leases ("***Executory Contract Motion***") to be heard at the same time.

Because of the improved financial health of the company, including increased sales and the ability to generate cash, the Company's Board of Directors felt it was prudent to revisit the decision to conduct a 363 sale as opposed to attempting a reorganization. After considering the risks and benefits to QL2's creditors and interest holders, the Board of Directors decided to pursue a plan of reorganization, with the projected result of payment in full of all allowed claims, securing a DIP Facility through the reorganization and a Sponsor Exit Facility after confirmation, providing future capital to support the growth of the company going forward, and ensuring that QL2 would remain as a viable Seattle-based entity.

2.4.2. <u>Withdrawal of 363 Sale Motion</u>. The Debtor has withdrawn the Sale Motion and Executory Contract Motion. In the Debtor's business judgment, the proposed Plan is preferable over the 363 sale process because it provides for payment in full of all known secured, unsecured and priority creditors, provides a favorable return to equity interests of QL2, and ensures that employees continue to be retained in Seattle. The Debtor anticipates seeking debtor-in-possession financing from Sponsor in the amount of $500,000.

## ARTICLE 3
## ASSETS AND LIABILITIES OF DEBTOR

**3.1**   <u>**Assets.**</u> The Debtor listed the following material personal property on its bankruptcy schedules with values as of the Petition Date.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

| | |
|---|---|
| Bank Accounts: | $ 4,681 |
| Deposits | 8,788 |
| Subsidiaries | 30,000 |
| Accounts Receivable | 1,440,153 |
| Personal Property (auction value): | 35,000 |
| TOTAL: | $1,518,622 |

QL2 also holds two patents whose value is unknown.

**3.2**    **Liabilities.**  The Debtor listed the following liabilities on its bankruptcy schedules as of the Petition Date.

3.2.1.  Secured Claims.  As of the Petition Date, the Debtor listed a debt owed to Graham & Dunn for attorneys' fees in the approximate amount of $589,000 that was secured by Debtor's personal property, and a Debt to the Tumelsons in the approximate amount of $518,123, secured by accounts receivable, stock and a patent.    In addition, the Debtor's bankruptcy schedules listed potential claims from equipment leases in the total amount of $8,858 for four lessors (Rocky Mountain Equipment Leasing LLC, Cashmere Valley Bank, CIT Tech. Finance Systems., and Dell Financial Services).

3.2.2.  Unsecured Claims.    As of the Petition Date, the Debtor listed approximately $405,107.56 in general unsecured claims and $30,027.60 in unsecured priority claims.

3.2.3.  Current Status of Claims.  Debtor has completed an analysis of claims and has a filed several claims objections, which objections have not yet been resolved. Debtor concludes that if all claims scheduled without dispute or filed, timely and late, meritorious and not, were allowed, the total would be approximately $4,672,019.  The Debtor estimates that ultimately allowed claims will be between $2 million and $3 million, including rejection claims.

3.2.4.  Insolvency Analysis.  The Debtor retained Charles Brent Hall as a financial consultant to conduct an insolvency analysis of QL2 as of the Petition Date (and also at the beginning of the preference period).   Mr. Hall concluded that the Company's liabilities exceeded the estimated fair market value of its assets on a balance sheet basis as of December 31, 2009 by $5,226,393. In addition to certain downward accounting adjustments, Mr. Hall opined that QL2's most significant liability was deferred revenue of $3,941,813 which consisted of advance contract payments from over 200 customers.   This liability was not reflected on the Bankruptcy Schedules as of the Petition Date.   The Debtor confirms that as of April 30, 2010, deferred revenues total $3.8 Million.   Mr. Hall also opined that the debtor's software had no significant market value.

3.2.5.  Fair Market Value of the Company.   The fair market value of the Company's equity securities is essentially zero when taking into consideration the fact that it cannot meet its obligations and that its liabilities far exceed its assets.  A report of value was prepared by Moss Adams as of November 2008 delivered to the Company in February 2009.  Moss Adams reached the conclusion that the Company had a fair market value of $9.6 million. Moss Adams performed three different valuation approaches and related techniques, most of which were deemed unreliable given that the Company is

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

privately held. The $9.6 million number was used to price stock options, and, it should be noted, certain assumptions regarding the Company's historical and forecasted financial performance used by Moss Adams in making the fair market value estimate were either inaccurate or not met. At that time, the organization had negative book value, which has continued to decline, and as Mr. Buffett points out, "intrinsic value" trends in the same direction as book value. Book value has declined and continues to be substantially negative. In addition, the company has generated an operating loss of over $850,000 in the last six months, and it is uncertain whether profitability can be sustained, given the Company's continued dependence on irregular, large orders. The Company's estimated annual cash inflows, which depend on obtaining renewals and new sales orders, are currently approximately $9.0 to $9.5 million versus cash expenses in excess of these numbers. For reasons including these, it is difficult to put an exact value on the Company as a going concern. In Chapter 11 reorganization cases, there are two methods to determine under a market efficiency pricing theory what the "value" of the company might be. The Debtor received two bids for substantially all of its assets, both of which were within $200,000 of each other, were highly conditioned, and evidenced enterprise valuations of approximately $6 million. The court has now received two competing plans of reorganization. The enterprise value of the joint plan of reorganization submitted by the Debtor and its sponsor Hale Global ranges from approximately $7.0 million to $12.0 million depending on the amount of claims ultimately allowed, the post-petition liabilities ultimately in the Company at time of close, and the number of shareholders who put or have called their equity. The chapter 11 process has, in effect, determined a valuation range for the company.

## ARTICLE 4
## SUMMARY OF PLAN OF REORGANIZATION

The Joint Plan of Reorganization appears in full as an Appendix to this Disclosure Statement. The discussion of the Plan that follows constitutes a summary only. You are urged to read the Plan itself before deciding to accept or reject it.

Pursuant to the Joint Plan of Reorganization that has been filed with the Bankruptcy Court, the Plan will be funded by income from operations, a "Sponsor Exit Facility" loan of up to $2,000,000 from the Sponsor and secured by the assets of the Debtor (with up to an additional $1,000,000 at the discretion of the Reorganized QL2 Board of Managers), and a cash "Sponsor Equity Contribution" in the amount of $2,000,000. On the Effective Date, QL2 will merge into a newly formed Delaware limited liability company to be formed by the Sponsor. Debtor anticipates borrowing up to $500,000 as debtor-in-possession financing from the Sponsor prior to plan confirmation, which borrowing will be folded into the Sponsor Exit Facility.

The Plan contemplates payment in full of all allowed secured, unsecured, and priority claims with interest from the Petition Date at the Plan Rate, and allowed administrative claims, at the Effective Date or fourteen (14) days after the claim becomes an Allowed Claim. Priority tax claims will be paid over five years.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

The Sponsor will receive 100% of the units of New Common in Reorganized QL2 plus its rights pursuant to certain loan agreements. QL2's existing owners (believed by Debtors to be the holders of approximately 2.3 million non-disputed shares of common stock) will receive in full satisfaction of their shares a pro rata share of 100% of New Preferred Units with an aggregate face amount of $1,000,000, subject to certain adjustments but not to be reduced below $500,000. The New Preferred owners will have certain attributes including a 5% annual dividend and certain liquidation, redemption and stock rights.

The existing preferred shareholder, Vince Borcich, whose interest is disputed, will, to the extent his interests are allowed, receive payment of a liquidation preference and/or if he exercises his conversion rights, treatment as an existing owner of common stock, as discussed above.

The Tumelsons will receive at the Effective Date cash in the amount of $650,000 in full satisfaction of their secured claim and 750,000 shares of common stock, which will then be sold to the Sponsor for $225,000, and will receive a broad general release from the Debtor..

## 4.1    Claims and Interests.

4.1.1.  Classification. The Plan establishes classes of claims and interests, and certain other Claims are Unclassified Claims pursuant to applicable provisions of the Bankruptcy Code. If the Plan is confirmed by the Court and becomes effective, the class into which each Allowed Claim and Allowed Interest fits will determine the manner in which such claim or interest will be treated. The classes defined in the proposed Plan are summarized below.

4.1.2.  Treatment Under the Plan. The Classification and Treatment of Claims and Interests Under the Plan, and the Means for Execution of the Plan, are set forth in Sections 2 and 3, respectively, of the Plan and are summarized below. Notwithstanding the summary provided below, the terms of the Plan shall control the classification and treatment of claims and all other aspects of Reorganized Debtor's rights and obligations as to matters governed by the Plan following the Effective Date. Parties are urged to read the Plan with care to determine the treatment proposed for their Claim or Interest.

4.1.3.  Impaired and Unimpaired Claims. The term "Impaired" as used herein refers to those creditors to whom this Disclosure Statement (and the Plan and other materials delivered together herewith) are being furnished and who are entitled to accept or reject the Plan. The term "Unimpaired" refers to those creditors whose claims or interests remain unaltered by the reorganization effectuated by the Plan. Pursuant to § 1126(f) of the Bankruptcy Code, it is not necessary to solicit acceptances from the holders of claims or interests in such classes.

## 4.2    Summary of Claims and Interests

4.2.1.  Class 1: Sponsor

4.2.2.  Class 2: Tumelsons

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

4.2.3. Class 3: Graham & Dunn

4.2.4. Class 4: Other Secured Claims

4.2.5. Class 5: Allowed Priority Claims

4.2.6. Class 6: Allowed General Unsecured Claims

4.2.7. Class 7: Old Preferred Shareholders

4.2.8. Class 8: Old Common Shareholders

**4.3  Treatment of Unclassified Claims.**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan, because they are automatically entitled to specific treatment provided for them in the Code. As such, Proponents have not placed the following claims in a class.

4.3.1. Administrative Claims. The Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular Creditor agrees in writing to a different treatment. With the exception of certain Professional Fees incurred to date and certain Disputed Administrative Claims, Debtor has paid all known Administrative Claims. Accordingly, Proponents believe that no significant arrearage other than Professional Fees will be owed on account of Administrative Claims at the Effective Date. A list of unpaid Administrative Claims will be provided to the Bankruptcy Court at or prior to the Confirmation Hearing, but are estimated not to exceed $400,000. To the extent any Allowed Administrative Claim other than for Professional Fees is incurred and remains unpaid on the Effective Date or arises after the Effective Date, such claim will be paid in accordance with the terms and conditions of the particular transaction and agreements relating thereto. If Debtor or Reorganized QL2 disputes an asserted Administrative Claim, such Claim will be paid within ten (10) Business Days after the Claim becomes an Allowed Claim by Final Order.

Professional Fees are subject to certain requirements imposed by the Code. Such fees and costs can only be paid pursuant to an order of the Court, after notice and hearing. Debtor will request a hearing before the Court as soon as practicable after the Effective Date on final fee applications to be filed by all Professionals, covering all Professional Fees incurred prior to the Confirmation Date.

Any Professional retained by Debtor prior to the Effective Date may continue to provide services to Reorganized QL2 from and after the Confirmation Date, and any additional Professionals may be retained by the Reorganized QL2 after the Confirmation Date without approval of the Court. All Professional Fees for services rendered after the Confirmation Date at the request or authorization of Reorganized QL2, whether or not rendered in connection with consummation or implementation of the Plan, are to be paid by Reorganized QL2 upon receipt of an invoice for such services, or on such other terms to which Reorganized QL2 may agree, without the need for further Bankruptcy Court

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

authorization. If Reorganized QL2 and any Professional cannot agree on the amount of post-Confirmation Date fees and expenses to be paid to such Professional, such amount shall be determined in accordance with applicable nonbankruptcy law.

Reorganized QL2 will be responsible for payment of all United States Trustee quarterly fees. The post-confirmation United States Trustee quarterly fees will be paid from Reorganized QL2's post-Confirmation assets and will be calculated based on disbursements made on Allowed Claims pursuant to the Plan.

4.3.2. <u>Priority Tax Claims</u>. Section 1129(a)(9)(C) of the Bankruptcy Code requires that each holder of a Priority Tax Claim receive the present value of such claim in deferred cash payments, over a period not exceeding five (5) years from the Petition Date.

Unless the holder of an Allowed Priority Tax Claim agrees to a different treatment, regular payments will be made sufficient to fully amortize each Allowed Priority Tax Claim over a period of five (5) years from the Petition Date. The outstanding and unpaid amount of each Allowed Priority Tax Claim will bear interest, commencing on the Effective Date and continuing until such Allowed Priority Tax Claim is paid in full, at the lesser of the following rates: (i) the interest rate available on ninety-day United States Treasuries on the Effective Date; or (ii) the rate specified by Section 6621(a) of the Internal Revenue Code on the Effective Date.

Payment of any Priority Tax Claim will commence on the later of (a) the first day of the first calendar quarter following the Effective Date, or (b) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Tax Claim. Such payments will continue on the first day of each calendar quarter thereafter, in accordance with the provisions of this Section. Reorganized QL2 shall be entitled to pay the Allowed Priority Tax Claims, or any lesser amount agreed upon by the Creditor, earlier than as set forth above without penalty.

**4.4 Classified Claims and Interests:**

4.4.1. **Class 1 (Sponsor).** Sponsor is the sole member of Class 1. Sponsor is the lender under the DIP Facility and is providing the Sponsor Exit Facility and the Sponsor Equity Contribution upon the occurrence of the Effective Date.

At the Effective Date, Sponsor shall receive 100% of the units of New Common plus its rights pursuant to the Sponsor Equity Contribution. Sponsor also is an Old Common Shareholder and will be treated as a member of Class 8 with respect to its shares of Old Common. Class 1 is **impaired.** As Sponsor is the sole member of Class 1 and is a Proponent of the Plan, Class 1 is conclusively deemed to vote in favor of the Plan.

4.4.2. **Class 2 (Tumelsons)**. The Tumelsons are the sole members of Class 2. Debtor has been engaged in litigation regarding the validity and priority of the Tumelson Secured Claim. Proponents intend to resolve the disputes regarding the Tumelson Secured Claim pursuant to the terms of the Plan, as follows.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

On the Effective Date, in full satisfaction of the Tumelson Secured Claim the Tumelsons will receive: (a) cash in the amount of $650,000; and (b) the 750,000 shares of Old Common currently held in escrow, which shall be Allowed Interests. The Tumelsons will be Old Common Shareholders and will be treated as a member of Class 8 with respect to the 750,000 shares of Old Common. Class 2 is **impaired** and is entitled to vote on acceptance or rejection of the Plan.

Pursuant to a separate agreement between the Tumelsons and Sponsor, immediately after the Effective Date the Tumelsons will sell the 750,000 shares of Old Common, or the units of New Preferred to be provided to Tumelsons as members of Class 8, to Sponsor for $225,000. Thereafter, Sponsor will be the owner of the 750,000 shares of Old Common or the units of New Preferred, as applicable.

Confirmation shall (i) constitute a release, effective as of the Effective Date, of any claims, causes of action, or rights of any nature whatsoever Debtor, Reorganized QL2, or the Estate may have, against the Tumelsons, and their partners, employees, agents, shareholders, members, managers, trustees, representatives, parents, subsidiaries, successors, assigns, affiliates, related entities, nominees and attorneys, acting individually and in their representative capacity on behalf of the Tumelsons, of and from any and all claims, demands, liabilities or actions of any nature whatsoever (the "***Released Tumelson*** Claims"), whether such Released Tumelson Claims, arising before the Effective Date, are known or unknown, or arise under state or federal law, including without limitation any claims relating in any way to the prior litigation between Tumelsons and Debtor and any Avoidance Actions, except those claims arising under or concerning the Plan and its enforcement, (ii) effect the dismissal with prejudice of the Tumelson Adversary Proceeding (as defined in the Disclosure Statement) as of the Effective Date, and (iii) entitle the Tumelsons to keep all prior payments of any kind made by the Debtor with regard to the Tumelson Secured Claim or the Tumelsons' claims against any other party.

4.4.3. **Class 3 (Graham & Dunn)**. Graham & Dunn is the sole member of Class 3. Graham & Dunn has asserted a Secured Claim in the amount of approximately $600,000 against Debtor and asserts that its Claim is secured by essentially all of Debtor's assets. Debtor and/or Reorganized QL2 may dispute some or all of the Class 3 Claim.

At the Effective Date, or within ten (10) Business Days after and to the extent the Class 3 Claim becomes an Allowed Claim pursuant to a Final Order, whichever is later, the holder of the Class 3 Claim will receive cash in the full amount of the Allowed Claim along with interest from the Petition Date at the Plan Rate. Pending such allowance and payment, the holder of the Class 3 Claim shall retain all security interests it may have in Debtor's and Reorganized QL2's assets. Class 3 is **unimpaired** and is not entitled to vote on the Plan.

4.4.4. **Class 4 (Other Secured Claims)**. To the extent there are any other Creditors who hold Allowed Secured Claims against Debtor and are not members of Class 1, Class 2 or Class 3, such other Secured Creditors are members of Class 4. Each such Allowed Secured Claim will be paid in accordance with its respective terms or as otherwise agreed to between Reorganized QL2 and such Creditor. To the extent there are any defaults in payment of such Allowed Secured Claims, such defaults will be cured by payment in full of any such delinquent amounts at the earlier of the Effective

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Date and ten (10) Business Days after such Claim becomes an Allowed Claim pursuant to a Final Order, whichever is later. Class 4 is **unimpaired** and is not entitled to vote on the Plan.

4.4.5. **Class 5 (Allowed Priority Claims)**. Class 5 consists of holders of Allowed Priority Claims. The Code requires that each holder of an Allowed Priority Claim receive cash on the Effective Date equal to the Allowed Amount of such claim. Allowed Priority Claims will be paid in full in cash on the Effective Date or within ten (10) Business Days after such Claim becomes an Allowed Claim by Final Order, whichever is later. Class 5 is **unimpaired** and is not entitled to vote on the Plan.

4.4.6. **Class 6 (Allowed General Unsecured Claims)**. Class 6 consists of Allowed General Unsecured Claims. Each Allowed General Unsecured Claim shall be paid in full in cash on the Effective Date or within ten (10) Business Days after such Claim becomes an Allowed Claim by Final Order, whichever is later, together with interest at the Plan Rate from the Petition Date to the date of payment. Class 6 is **unimpaired** and is not entitled to vote on the Plan. However, members of Class 6 may express a preference as to which Plan they support.

4.4.7. **Class 7 (Old Preferred Shareholders)**. To Debtor's knowledge there is only one Old Preferred Shareholder and thus only one member of Class 7, Vincent Borcich (**"Borcich"**), a former member of the board of directors of Debtor. Borcich appears to have invested $400,000 in Debtor. Borcich appears to have received a stock certificate evidencing ownership of 500,000 shares of Old Preferred. In an adversary proceeding filed June 7, 2010, Adv. Pro. No. 01300, Debtor has objected to Borcich's claims and interests on various grounds, including the invalidity of the corporate actions and approvals leading to the issuance of the Borcich stock certificate and Borcich's liability to Debtor for misconduct prior to the commencement of the Chapter 11 Case.

By one reading of the terms of the Old Preferred, which are disputed, Borcich as an Old Preferred Shareholder is entitled to a liquidation preference of $400,000 plus certain accrued but unpaid dividends and conversion rights. Debtor understands Borcich contends the total amount due is approximately $415,000. In addition, by one disputed reading of the terms of the Old Preferred Borcich may exercise conversion rights and the shares of Old Preferred would be converted to up to 800,000 shares of Old Common.

Borcich as a member of Class 7 will, if and to the extent his interests are Allowed, receive the treatment provided for in the Debtor's Articles of Incorporation and related documents to the extent such documents were validly issued, namely payment of the liquidation preference and/or, if he exercises his conversion rights, will obtain shares of Old Common and will be treated as a member of Class 8 in accordance with the provisions set forth below. Class 7 is **unimpaired** and is not entitled to vote on acceptance or rejection of the Plan. However, because an Old Preferred Shareholder may exercise his conversion rights and become an Old Common Shareholder, in that capacity his rights will arguably be impaired as set forth in the next succeeding section. Debtor is therefore as a matter of prudence soliciting votes from Class 7 but does not believe those votes should be considered unless the Class 7 member has actually exercised his conversion rights, in which case the votes, if Allowed, will be considered as Class 8 votes.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**4.4.8. Class 8 (Old Common Shareholders).** Class 8 consists of the holders of QL2's common stock with Allowed Interests ("Old Common"). Debtor's records indicate that at the Petition Date there were approximately 97 Old Common Shareholders holding a total of approximately 2,300,000 Old Common shares which are not disputed. Since the Petition Date a number of shares of Old Common have changed hands. Certain of the Old Common Shareholders appear to have received their Old Common for no or inadequate consideration. Those claims and interests have been or will be the subject of objections from the Debtor.

Each Old Common Shareholder will receive, in full satisfaction of its shares of Old Common a pro rata share (based on the number of shares of Allowed Old Common held by such Old Common Shareholder) of 100% of the New Preferred units with an aggregate face amount of $1.0 million. The total face amount of New Preferred, as determined under the preceding sentence, is (the "*Original Preferred Face Amount*").

The New Preferred shall have the following attributes:

- Dividend of 5.0%, payable annually on anniversaries of the Effective Date

- Declared but unpaid dividends shall be non-cumulative and paid annually at the dividend rate. No dividends may be paid by Reorganized QL2 on its common equity unless all dividends and redemption payments relating to the New Preferred are current.

- In the event of any liquidation or winding-up of the Company, holders of New Preferred shall be entitled to receive, in preference to holders of Common Units, an amount equal to their pro rata portions of the Original Preferred Face Amount plus any declared but unpaid dividends (senior in priority upon liquidation or deemed liquidation to all common equity of Reorganized QL2) (the "*Liquidation Preference*"). For these purposes, "deemed liquidation" means a change in control or sale of all or substantially all of the assets of QL2 and subsidiaries. In addition, for these purposes prior to a judgment in the Borcich litigation described above the Liquidation Preference will be computed on the basis of the approximately 3.1 million (non-Borcich) Old Common shares. If a judgment in the Borcich litigation results in any Old Common or New Preferred shares being issued to Borcich, the Liquidation Preference will thereafter be computed including those Borcich shares.

- Holders of New Preferred shall be entitled to require the Company to redeem such units at any time before the fifth anniversary of the Effective Date, at a price equal to the Liquidation Preference.

- The New Preferred is also subject, at the sole option of Reorganized QL2, to mandatory redemption at any time prior to the fifth anniversary of the Effective Date for a redemption price equal to three times the Liquidation Preference.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

- Any New Preferred that is not redeemed (either by the holder or by the Company pursuant to above provisions) prior to the fifth anniversary of the Effective Date shall at that time automatically convert to a pro rata share of 20% of the New Common (adjusted for any prior redemptions and for issuances of other units after the Effective Date).

- The New Preferred shall contain certain protective voting provisions as set forth in Plan Section 3.1.

- Each of the New Preferred Unitholders shall grant a right of first refusal with respect to any sale or transfer of units by such holder first, to the Company, second, to the remaining New Preferred Unitholders pro rata in accordance with their respective percentages of the outstanding New Preferred; and third, if the rights of first refusal are not exercised in whole, to Sponsor.

All such attributes shall be specifically set forth in the Reorganized QL2 LLC Agreement to be filed with the Plan Supplement. Class 8 is **impaired** and is entitled to vote on acceptance or rejection of the Plan. In addition, members of Class 8 are entitled to express a preference as to which Plan they support.

Debtor notes that there are a number of purported stock options outstanding, many if not most of which are likely to be disputed. In the event a holder of any option desires to exercise such option, Debtor will consider the validity of the option and, if appropriate, dispute such exercise. Debtor does not believe any such holder is likely to attempt to exercise options because as far as Debtor can determine all of such options are "out of the money" given the current financial status of Debtor.

## ARTICLE 5
## MEANS OF EFFECTUATING THE PLAN.

### 5.1 Postconfirmation Ownership and Management

At the Effective Date, QL2 will merge into a newly formed Delaware limited liability company to be formed by Sponsor. The resulting entity will be for all purposes of the Plan referred to as "Reorganized QL2." From and after the Effective Date, Reorganized QL2 will be owned as follows: (a) Sponsor will own 100% of New Common and (b) Allowed Old Common Shareholders will own 100% of New Preferred on a pro rata basis.

As of the time of dissemination of this Disclosure Statement, Sponsor has not completed its analysis of the tax implications of the proposed structure for Reorganized QL2. It is possible the proposed structure, such that a different form of entity or different kind of transaction, will be more beneficial to the parties in interest. Whatever entity or structure is chosen, the governance and economic provisions for Reorganized QL2 as described in this Disclosure Statement will be replicated for the benefit of the Allowed Old Common Shareholders.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Reorganized QL2 will be a manager-managed limited liability company, governed by a Board of Managers with power to control all operations and activities of Reorganized QL2. The Board of Managers may obtain the assistance of officers and other agents to be selected by the Board of Managers and who will serve at the pleasure of the Board of Managers. The initial members of the Board of Managers and initial executive officers will be identified in the Plan Supplement.

Absent a default in payment of any dividends or mandatory redemptions to or on account of New Preferred, there will be three Managers. Upon a default in payment of any dividends or mandatory redemptions to or on account of New Preferred while at least 50% of the original New Preferred remains outstanding, the holders of New Preferred will have the right to designate two additional Managers; and upon a default in payment of any dividends or mandatory redemptions to or on account of New Preferred while at least 25% but less than 50% of the original New Preferred remains outstanding, the holders of New Preferred will have the right to designate one additional Manager.

The Board of Managers will act by majority vote for ordinary course operations, but certain fundamental transactions such as secured financing and sale of all or substantially all of the assets of Reorganized QL2 will require a unanimous decision of all Managers then in office. All of such fundamental transactions and other provisions will be specified in Reorganized QL2's Limited Liability Company Agreement to be filed with the Plan Supplement (the "*Reorganized QL2 LLC Agreement*").

Reorganized QL2 will not be authorized to amend its Limited Liability Company Agreement in a manner that adversely affects the rights of the New Preferred or issue any equity security which is senior to New Preferred as to dividend rights, redemption rights, liquidation preference or similar rights without the approval of a majority of the outstanding units of New Preferred. In addition, so long as at least 50% of the initially issued New Preferred remains outstanding, Reorganized QL2 may not within the first five years after the Effective Date consummate any transaction in which Reorganized QL2 effects a change of control or sale of all or substantially of its assets unless the transaction results in proceeds to the New Preferred of at least the Liquidation Preference then payable to the New Preferred Unitholders.

Reorganized QL2 will have the right to establish such employee incentive plans, including unit ownership plans or other incentives, as Reorganized QL2's Board of Managers determine in its discretion.

**5.2 Funding for the Plan.**

The Plan will be funded by cash on hand at the Effective Date, income from operations, the Sponsor Exit Facility, and the Sponsor Equity Contribution.

**5.3 Operations**.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

From and after the Effective Date, Reorganized QL2 will operate its business under the direction of Reorganized QL2's Board of Managers, continuing the business operated by Debtor with such modifications, extensions, additions, and other changes as the members of the Board of Managers may determine in their business judgment, including without limitation obtaining additional equity or debt financing without the need for approval of the Bankruptcy Court or any other person except as specifically provided in the Reorganized QL2 LLC Agreement.

**5.4 Distributions.** Reorganized QL2 will make the following Distributions:

**(a) Initial Distribution**

On or as soon as practicable after the Effective Date, Reorganized QL2 will make the payments described herein to holders of all Allowed Claims to the extent those payments are due on or soon after the Effective Date.

Debtor will file with the Plan Supplement a schedule of all Claims Debtor believes should be Allowed at the Effective Date without further proceedings.

**(b) Final Distribution**

Reorganized QL2 will make a Final Distribution when all Disputed Claims have been adjudicated.

**(c) Disputed Claims**

Reorganized QL2 will implement the following procedures with respect to the distributions to the holders of Disputed Claims that become Allowed Claims:

(i) No property will be distributed under the Plan on account of any Disputed Claim or portion thereof, unless and until such Disputed Claim becomes an Allowed Claim.

(ii) Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as otherwise expressly provided for below, from and after the Effective Date Reorganized QL2 will have the exclusive right (except as to applications for allowances of compensation and reimbursement of expenses under Sections 330 and 503 of the Bankruptcy Code) to make and file objections to Claims and will serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than one hundred and twenty (120) days after the Effective Date. Any Claims that are not objected to within such 120 day period shall be deemed Allowed and will be paid within ten days of expiration of such period without further order of the Bankruptcy Court.

(iii) Nothing in the Plan shall preclude Reorganized QL2 from filing appropriate pleadings before the Bankruptcy Court requesting that certain Disputed Claims be estimated pursuant to Code Section 502(c) for the purposes of Distributions. If the Bankruptcy Court estimates any such Disputed Claims for purposes of Distributions, the amounts so fixed or liquidated will be deemed to be Allowed Claims pursuant to Section 502(c) of the Bankruptcy Code for purposes of Distribution under the Plan.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

(iv)     When a Disputed Claim becomes an Allowed Claim, there will be distributed to the holder of such Allowed Claim, no later than ten (10) Business Days after the Order allowing such Claim becomes a Final Order, cash equal to amount of the Allowed Claim.

(v)     No holder of a Disputed Claim will have any Claim against Reorganized Debtor or its assets until such Disputed Claim becomes an Allowed Claim.

(vi)     Any Disputed Claim may be resolved consensually by means of a stipulation between the claimant and Reorganized QL2. Such stipulation shall be filed with the Court and may in the discretion of Reorganized QL2 be presented to the Court for approval and entry as appropriate, but such approval shall not be a condition to effectiveness of such stipulation.

**(d)     Distribution Addresses; Undeliverable Interim Distributions**

All Distributions under the Plan are to be made by Reorganized QL2 to the holder of each Allowed Claim at the address of such holder as scheduled, latest proof of claim or interest filed by such holder, or as otherwise directed in writing by such holder of an Allowed Claim (as the case may be). If any holder's Distribution is returned as undeliverable, no further Distributions to such holder will be made unless and until Reorganized QL2 is notified of such holder's then current address, at which time all required Distributions will be made to such holder. Except as set forth in the succeeding sections, undeliverable Distributions will be held by Reorganized QL2 until such Distributions are claimed.

**(e)     Unclaimed Interim Distributions**

In the event that at the time Reorganized QL2 is preparing the Final Distribution there are any Distributions that have not been claimed, whether for failure to cash checks, return of checks for undeliverable addresses, or any other reason, all such unclaimed distributions will revert to Reorganized QL2 as if such Claim were never an Allowed Claim. The Claim of any holder or successor to such holder with respect to such unclaimed Distribution, as well as any Claim of such holder or successor on account of the Final Distribution, will be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

**(f)     Unclaimed Final Distributions**

All unclaimed and uncashed funds remaining 120 days after the Final Distribution will revert to Reorganized QL2. If there are any checks for Final Distributions that have been returned as undeliverable, or if any checks for Final Distributions remain uncashed at that time, all such unclaimed or uncashed checks will be null and void. The Claim of any holder or successor to such holder with respect to such Final Distribution will be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**(g)    Post-Effective Date Distributions**

Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, will be deemed to have been made on the Effective Date.

**(h)    Fractional and *de minimis* Amounts**

Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down.

Notwithstanding anything contained herein to the contrary, no payment of less than $100.00 will be made. Whenever a payment of less than $100.00 would otherwise be made in any Interim Distribution, that amount will be retained by Reorganized QL2 pending the Final Distribution. Whenever a payment of less than $50.00 would otherwise be made in the Final Distribution, it will be removed from consideration of payments and such moneys will be retained by Reorganized QL2.

**ARTICLE 6**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Entry of the Confirmation Order will constitute Bankruptcy Court approval of Debtor's assumption, effective as of the Effective Date, of the executory contracts and unexpired leases set forth in a schedule to be filed as part of the Plan Supplement (the "*Assumed Contracts*"). Assumption of any customer executory contract shall include assumption of the associated liability for deferred revenue relating to such customers resulting from unearned prepayments received by the Company estimated with other assumed liabilities to total at least $4 million. The Plan Supplement will contain a proposed cure amount for each such Assumed Contract. Any person who disputes Debtor's proposed cure amount shall file a pleading objecting to such proposed cure amount no later than the time objections to confirmation are due. If the parties are unable to resolve the dispute over cure amounts, the dispute will be resolved at the Confirmation Hearing, unless Debtor elects subject to the Bankruptcy Court's approval to have the dispute resolved after the Confirmation Hearing.

Entry of the Confirmation Order will constitute Bankruptcy Court approval of Debtor's rejection, effective as of the Effective Date, of the executory contracts and unexpired leases set forth in a schedule to be filed as part of the Plan Supplement (the "*Rejected Contracts*").

To the extent that Debtor is still a party to any other executory contract or unexpired lease on the Confirmation Date that has not yet been assumed or rejected, is not on the schedule of Assumed Contracts or the schedule of Rejected Contracts, and is not then subject to a motion to assume or reject,

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

the Confirmation Order will be deemed to constitute Bankruptcy Court approval of the rejection of any such executory contracts and unexpired leases.

In the event any executory contract or unexpired lease is rejected pursuant to the Plan or otherwise, the last date for filing a proof of claim for damages arising from such rejection shall be thirty (30) days after entry of the Confirmation Order or entry of the order approving such rejection, as applicable.

## ARTICLE 7
## LIQUIDATION ANALYSIS

If the Bankruptcy Court finds at the hearing on confirmation of the Joint Plan that the holders of claims will receive or retain under the Plan property of a value as of the Effective Date of the Plan that is not less than the amount that such holders would receive or retain if the Debtor was liquidated under Chapter 7 as of such date, then the requirements set forth in § 1129(a)(7)(ii) of the Bankruptcy Code, commonly referred to as the "best interest of creditors" test, will be satisfied. This requirement must be satisfied with respect to a class of claims or interests only if less than all holders of claims or interests in such class have accepted the Plan.

At this point, the Plan Proponents believe that the Plan provides the best recovery for creditors and equity interests, at the least administrative cost. Because the Joint Plan proposes to pay creditors 100% of their claims together with interest, creditors will receive at least what they would likely receive in connection with a liquidation under Chapter 7. Because the Joint Plan eliminates all risk of insolvency of the Debtor, effects a reduction of the Tumelson claim, eliminates massive rejection damages claims by assumption of contracts, and proposes to pay a guaranteed Liquidation Preference, the distribution to shareholders of units of New Preferred is well in excess of what they would likely receive in connection with a liquidation under Chapter 7

## ARTICLE 8
## RISK FACTORS

Distributions to creditors and interests contemplated under the Plan are contingent upon many assumptions, some or all of which could fail to materialize and preclude the Plan from becoming effective or reduce anticipated distributions. Most important, however, is that the Plan is subject to approval by the certain classes of creditors and interests entitled to vote under the Bankruptcy Code and to confirmation of the Plan by the Bankruptcy Court. Although the Proponents believe this will be met, no assurance can be given that the Plan will be accepted by the requisite number and amount of creditors and interests or confirmed by the Court. In that event, due to the costs and uncertainties inherent in a modified Plan of Reorganization or a conversion and liquidation under Chapter 7, all creditors and interests of the estate face substantial risk that their recovery under such alternative circumstances may be substantially less favorable than their recovery provided for by the Plan.

Proponents believe that the business conditions of QL2 have stabilized and that, with the infusion if necessary of a $500,000 DIP Facility, QL2 will have sufficient cash to meet its needs prior

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

to Confirmation. Debtor is current with all of its postpetition obligations, with the exception of administrative claims which have not yet been submitted and approved.

In addition, the Plan is subject to certain Conditions to Effectiveness as set forth in Plan Section 4.1, including some limitations on amounts of other categories of claims and confirmation that there will be no adverse tax consequences resulting from confirmation. Debtor believes those conditions will be satisfied at or before Confirmation.

## ARTICLE 9   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### 9.1    Introduction

The following discussion summarizes certain United States federal income tax consequences of the implementation of the Plan to the Debtor and Holders of Claims and Interests. The following summary is based on the Internal Revenue Code of 1986, Treasury regulations thereunder, judicial decisions and published rulings and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in these rules, or new interpretations of these rules, may have retroactive effect and could significantly affect the federal income tax consequences described below. The federal income tax consequences of the Plan are complex and are subject to uncertainties. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, and it does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, insurance companies, financial institutions, small business investment corporations, regulated investment companies, tax-exempt organizations or investors in pass through entities). ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO THE HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS IN DETERMINING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES TO THEM OF THE PLAN.

### 9.2    Tax Consequences to the Debtor

Generally, under the terms of the Plan, all Claims and Interests are to be released upon payment in accordance with the Plan. Any income corresponding to the satisfaction of Claims at a discount should not constitute taxable income to the Debtor since the debt forgiveness arises in connection with

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

a case under Title 11 of the United States Code. The Debtor, however, may be required to reduce certain tax attributes, such as net operating losses ("*NOLs*").

Merger of a C corporation such as the Debtor into a limited liability company will likely be deemed a liquidation of the Debtor for tax purposes. The Debtor does not believe such a deemed liquidation will cause material adverse tax consequences either to the Debtor or to Reorganized QL2, although that analysis is ongoing. It is a Condition to Effectiveness of the Plan that the Proponents confirm that lack of material adverse tax consequences.

## 9.3    Tax Consequences to Creditors

### 9.3.1.    In General

The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on (a) whether its Claim constitutes a debt or security for federal income tax purposes, (b) whether the holder of the Claim receives consideration in more than one tax year, (c) whether the holder of the Claim is a resident of the United States, (d) whether all of the consideration by the holder of the Claim is deemed received by that Holder of the Claim as part of an integrated transaction, (e) whether the holder of the Claim reports income using the accrual or cash method of accounting, and (f) whether the holder of the Claim has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

### 9.3.2.    Gain or Loss on Exchange

Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hand of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange. Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

## 9.4    Tax Consequences to Shareholders

Because the merger of the Debtor into a limited liability company will likely be treated as a deemed liquidation of the Debtor, it is likely that effectiveness of the Plan will be a taxable event for

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Shareholders. Each Shareholder will most likely recognize gain or loss depending on his or her basis in the shares and the value of the equity received in Reorganized QL2. Each Shareholder should consult with his or her tax advisor for such purposes.

## 9.5 Information Reporting and Backup Withholding

Under the backup withholding rules of the Internal Revenue Code, Holders of Claims may be subject to backup withholding at the rate of thirty-one percent (31%) with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income. Any amount withheld under these rules will be credited against the holder's federal income tax liability. Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

## ARTICLE 10
## CONFIRMATION OF THE PLAN

## 10.1 Voting Procedures

A ballot to be used for voting your acceptance or rejection of the Debtor's Plan of Reorganization is being mailed to you together with this Disclosure Statement and Plan. Holders of claims should read the instructions carefully, complete, date and sign the ballot, and transmit it in the envelope enclosed. IN ORDER TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE INDICATED ADDRESS **NOT LATER THAN 4:00 P.M. P.D.T. ON JULY 30, 2010**. FAILURE TO VOTE OR A VOTE TO REJECT THE PLAN WILL NOT AFFECT THE TREATMENT TO BE ACCORDED A CLAIM OR INTEREST IF THE PLAN NEVERTHELESS IS CONFIRMED.

If more than one-half in number of claimants voting and at least two-thirds in amount of the allowed claims of such claimants in each class of claims vote to accept the Plan, such classes will be deemed to have accepted the Plan. If at least two-thirds in amount of the shares voted in a class of equity interests are voted to accept the Plan, such Class will be deemed to have accepted the Plan. For purposes of determining whether a class of claims or interests has accepted or rejected the Plan, only the votes of those who have timely returned their ballots will be considered.

## 10.2 Hearing on Confirmation

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

The hearing on confirmation of the Plan has been set for Friday, August 6, 2010 at 11:00 a.m., before the Honorable Karen A. Overstreet, United States Bankruptcy Judge, in U.S. Bankruptcy Court in Seattle, Washington. The Bankruptcy Court shall confirm the Plan at that hearing only if certain requirements, as set forth in § 1129 of the Bankruptcy Code, are satisfied.

## 10.3    Feasibility

The Debtor must also establish that confirmation of the Plan is not likely to be followed by the Reorganized Debtor's liquidation, or the need for further financial reorganization. To the extent necessary, the Debtor will present testimony with respect to feasibility at the hearing on confirmation of the Plan. The Debtor believe that the Plan is feasible and that the Bankruptcy Court will so find, but a Bankruptcy Court finding of feasibility does not guarantee that the Debtor will successfully complete or pay all its obligations under the Plan.

## 10.4    Treatment of Dissenting Classes of Creditors

The Bankruptcy Code requires the Bankruptcy Court to find that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan. Upon such a finding, the Bankruptcy Court may confirm the Plan despite the objections of a dissenting class (commonly referred to as "cramdown"). The Debtor has requested that the Court confirm the Plan even if creditors holding claims in impaired classes do not accept the Plan.

## 10.5    Effect of Confirmation

Confirmation of the Plan shall operate on the Effective Date as a discharge of the Debtor from all claims and indebtedness that arose before the Effective Date, except for those unclassified claims that Reorganized QL2 agrees to pay as a continuing obligation. All such discharged claims and indebtedness shall be satisfied by the cash payment or other consideration provided under the Plan. Upon Confirmation, all property of the Debtor's estate shall be free and clear of all claims and interests of creditors, except as otherwise provided in the Plan or the order of the Bankruptcy Court confirming the Plan. Reorganized QL2 shall be vested with all assets of the Debtor's estate including Avoidance Actions and choses in action. The provisions of the Plan shall bind the Debtor, Reorganized QL2, and all other parties in interest, including any creditor of the Debtor, whether or not such creditor is impaired under the Plan and whether or not such creditor has accepted the Plan.

In addition, confirmation of the Plan shall constitute a release, effective as of the Effective Date, of any claims, causes of action or rights of any nature whatsoever Debtor, Reorganized QL2, or the Estate may have, known or unknown, liquidated or unliquidated, fixed or contingent, against Sponsor or any of its members, officers, agents and professionals, or against any of Debtor's officers, directors and agents in such positions as of the date of filing the Plan, and Professionals employed pursuant to Orders of the Bankruptcy Court, for matters relating to the Chapter 11 Case or otherwise arising after the Petition Date and prior to the Effective Date; provided that such release shall be effective only upon

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

receipt by Reorganized QL2 of a mutual general release, in form and substance reasonably acceptable to Reorganized QL2, releasing and waiving any claim such person has or may have against Debtor or the Estate, or against any of the other persons described above relating in any way to the Debtor or the Estate, for matters arising prior to the Effective Date (with such exceptions as Reorganized QL2 may determine with respect to ordinary course employment claims and timely filed proofs of claim). Further, certain indemnification obligations for the benefit of such persons shall be deemed assumed, and the Confirmation Order shall constitute a release of liability for any actions taken or omissions by such persons in connection with the Chapter 11 Case or the Plan other than actions and omissions which constitute gross negligence or willful misconduct. Those provisions are described in more detail in Section 5.2 of the Plan.

**10.6    Consequences of the Failure to Confirm the Plan**

In the event the Court declines to confirm the Debtor's Plan, whether due to a failure of creditor support or otherwise, a liquidation might ultimately result, either through a revised Plan under Chapter 11 or conversion of this Chapter 11 case to a bankruptcy under Chapter 7 of the Bankruptcy Code.

Executed as of the 2nd day of July 2010.

QL2 SOFTWARE, INC.


/s/ Brian Vincent
By_____
Brian Vincent, Interim Chief Executive Officer


KARR TUTTLE CAMPBELL


/s/ Diana K. Carey
By:    _____
Diana K. Carey  WSBA #16239
Attorneys for Debtor and Debtor-in-Possession.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100